Green, Judge,
delivered the opinion:
Plaintiff brings this suit to recover $6,530.51 balances unpaid the plaintiff for cement delivered to the Government pursuant to two written contracts. The defendant sets up certain counterclaims, which will hereinafter be set forth, based upon alleged overpayments to the plaintiff upon other contracts. There is no dispute about the amount unpaid under the two contracts upon which plaintiff brings suit. The controversy in the case is wholly with relation to the counterclaims set up by the defendant. All of these counterclaims pertain to contracts made by plaintiff for the delivery of cement to the defendant.
defendant’s first counterclaim
Taking up the first counterclaim, we find that on January 22, 1918, the plaintiff entered into a written contract, No. 34650, for the delivery to the defendant of 6,000 barrels of cement in cloth bags at $1.55 per barrel, amounting to a total of $9,300. Plaintiff completed delivery in accordance with the contract on May 29, 1918, and was fully paid therefor in accordance with the terms and provisions of the contract, the final payment being made on July 22, 1918.
On May 1, 1918, the plaintiff wrote defendant that there was a balance due of 4,499 barrels on contract No. 34650, and that invoices would be rendered at the “present commercial price,” but that “This price is subject to revision in the event that a different price is agreed upon either between ourselves or the Portland Cement Committee and the War Industries Board.” To this communication an answer was *704 returned by the Paymaster General through whom the contracts had been made with the defendant, containing the following statement:
“With regard to the above reference, please be advised that delivery of cement on Contract 34650 will be required as specified in that contract and invoices rendered at the price agreed upon. The question of increased unit price due to advance in freight rates or an increased price agreed upon by the War Industries Board and approved by the Secretary of the Navy, will be made the subject of an amendment to this contract and all deliveries made that are subject to such increase will be adjusted later.”
On May 10, 1918, a supplemental contract was executed between the parties amending contract No. 34650, as follows:
“The price for Portland cement on the original of contract No. 34650 is composed of an approved f. o. b. plant price plus the freight charges per barrel at destination. The delivered price specified is therefore subject to adjustment for any increase or decrease in freight rate authorized by the Interstate Commerce Commission or by competent authority during the life of the contract.
“Accordingly the contractor will be reimbursed for the advance rate made effective by direction of the Interstate Commerce Commission at a general session held March 12, 1918, and providing that ‘commodity rates on cement may be increased by one cent per hundred pounds.' The commission’s order affects all the commodity cement rates in official classification territory.”
On September 1, 1918, the parties entered into another contract supplemental to No. 34650, which provided among other things, that on all shipments of cement on and after May 1, 1918, the price stated in the original contract would be changed to $2.18 f. o. b. Northampton, Pa., and that freight charges between Northampton, Pa., and destination would be added to face of invoice as a separate item, but freight charges were to be prepaid to destination. Also, that cloth bags in good condition would be returned to the contractor, and for such bags the cement company would remit at the rate of 10 cents each.
The Government, on January 14, 1919, paid the plaintiff, pursuant to the terms of the supplemental contracts above set forth, the sum of $4,249.01 over and above the amount required to be paid by the original contract No. 34650. *705 By these supplemental contracts the Government officials, acting on behalf of the defendant, agreed to make certain payments in addition to those provided in the original contract. The defendant contends that these agreements to make additional payments were without consideration, in that plaintiff agreed to do nothing but that which was required by the original contract; that consequently there was no authority on the part of the officers acting for the Government to enter into these supplemental contracts, and defendant is entitled to receive back the additional payments so made.
It needs no argument to show that no officer of the defendant had any authority to make a contract on behalf of the Government for which it received no benefit or consideration. It is equally well settled that where the provisions of a contract are changed by a subsequent agreement between the same parties such agreement has no force and effect unless there is some consideration moving to the party adversely affected by such changes. See J. J. Preis & Co. v. United States, 58 C. Cls. 81, 86; Cohen, Endel & Co. v. United States, 60 C. Cls. 513, 518; and Yale & Towne Mfg. Co. v. United States, 67 C. Cls. 618, 625. Nor will the fact that the contract had not been completely performed at the time the plaintiff asked for or demanded increased compensation, to which the other party acceded, make the supplemental contract for an additional payment valid. Alaska Packers’ Ass’n v. Domenico et al., 117 Fed. 99, 102.
The soundness of the principles upon which counsel for defendant base their argument must be conceded, but the fundamental question still remains as to whether the rule contended for on behalf of defendant has any application in the case now before us.
In this connection it should be observed that the claim made on behalf of defendant that it is entitled to receive back the additional payments made pursuant to the supplemental contracts rests upon the contention that the two supplemental contracts amending contract No. 34650 were of no contractual force and that therefore the payments so made can be recovered back. For the purposes of the argument it may be conceded that these two instruments have no *706 contractual force, but plaintiff’s case, as we view it, does not depend upon whether these instruments were valid as contracts, which we find unnecessary to determine. The fundamental question in the case is whether there was a preliminary agreement between the parties which applied to any contract thereafter executed between them for the purchase of cement. In determining this question we will next consider the somewhat peculiar circumstances of the case at bar.
The original written contract, No. 34650, signed by both parties, involved in the first counterclaim and contract No. 35890 involved in the third counterclaim, were preceded by communications with reference to the purchase of cement which passed between plaintiff and defendant and a series of acts and announcements done and made by defendant in accordance with statements made in the communications. The plaintiff contends that all this brought about an understanding between the parties to the effect that the price stated in contract No. 34650 for cement was tentative only, and subject to prices and terms fixed by the price-fixing committee of the War Industries Board. To this defendant answers that parol evidence can not be received to vary a written agreement, and that all prior representations, proposals, and negotiations are conclusively presumed to have become merged in the written agreement which expresses the ultimate conclusion and final intention of the parties. Here again the general rule may be conceded to be as stated by counsel for defendant, although there are many exceptions thereto, which in so far as the rule is applied to parol evidence, we do not need to consider. The case, as we think, does not depend on whether some understanding existed between the parties which is shown only by parol evidence, although even if this were the situation collateral agreements may be shown by parol. Such collateral agreements have been held to be valid in many instances where they vary the effect of the written agreement; and the rule has been laid down that where the circumstances show that the written agreement does not express the whole agreement of the parties either in regard to the subject matter of the contract or in regard to some particular provision, a collateral agreement may be received to show the extent of the application *707 of a certain portion of the written contract. Williston on Contracts, Vol. II, sec. 642-644. But we have no occasion to determine the effect of parol evidence upon a written contract. The contractual part of the communications and negotiations had between plaintiff and defendant was entirely in writing, and if the evidence to some extent is in parol with reference to subsequent proceedings on the part of the defendant in accordance with statements made in these communications and negotiations it is received merely as explanatory of the intentions of the parties and meaning of the language used therein. If, in fact, a contract was entered into between the parties by virtue of these negotiations and their subsequent action, it is well settled that the surrounding circumstances may be shown by parol evidence to show the intention of the parties, if the contract is indefinite or ambiguous.
It should be kept in mind at this point in the discussion that we are not speaking of the written contracts, No. 34650 and No. 35890, signed by both parties, but of a preliminary contract collateral thereto made between the parties which, in our opinion, is established by evidence properly admitted. This evidence will next be considered.
All of the contracts involved in the case were entered into during the World War, which created peculiar and unusual conditions. The court will take judicial notice that the Government was in immediate need of great quantities of cement, and that it had determined to exercise its war powers by fixing the prices which it would pay for this cement and the terms of the contracts which might be entered into for the purchase tñereof. In other words, it did not propose to be held for extortionate or unreasonable prices, nor, on the other hand, fail to pay the manufacturers of cement just compensation for the cement which it received. This was not only common knowledge, but is fully confirmed by the evidence in the case.
But the needs of the Government were so immediate and pressing that it could not wait for an investigation as to what these prices should be, or even in some instances for formal contracts, for the exigencies of the Great War permitted of no delay.
*708 Such being the situation, the Secretary of the Navy, on June 13,1917, sent a communication to the plaintiff and other cement manufacturers inclosing a skeleton copy of a proposed contract for cement, and stated therein that while prices stated in this skeleton contract had not been approved, “it is requested that you proceed with the deliveries of any cement required by the Navy, ” and in substance that while it had so far been impracticable to determine the price to be paid it was expected in the near future that an organization would be established to inquire into the matter before prices were fixed, and that in the meantime on any cement delivered a reasonable profit was assured. The letter also indicated that it was expected to have the matter determined in the near future, and that the cement manufacturers would be given an opportunity to be heard before the price was fixed.
The Navy Department, in a further communication to the plaintiff with reference to this subject, stated, under date of November 1, 1917:
“With reference to determination of price, and payment of invoices, please be advised that effort is being made to obtain early action from the War Industries Boai'd on cost of production of the cement industry reported by the Federal Trade Commission. You are assured that payment of your invoices will be made promptly upon receipt of official information concerning the price fixed by the President” (Italics ours.)
The statements made in these communications are somewhat ambiguous, and it is necessary that we should determine what the Secretary of the Navy intended and how the plaintiff might reasonably understand the language used. In so doing we are permitted to consider the surrounding circumstances, the subject matter of the letters, the action which the parties took, and the construction which the defendant as well as the plaintiff put upon these letters. It is plain that the Secretary of the Navy could have forwarded the skeleton contract for no other purpose except that plaintiff would be able to ascertain the general form of contracts for the purchase of cement. The letter of November 1, 1917, states expressly that it is written with reference to “determination of price and payment of invoices” and that payment would be made “upon receipt of official information concerning the *709 price fixed by the President.” This, we think, could only mean that when the price was “fixed by the President,” payment would be made for the cement in accordance therewith. If any doubt exists as to the meaning of these communications, it is set at rest by the letter of the plaintiff to the pay director of the Navy, dated May 1, and the answer which was received thereto on May 4, 1918. The letter of plaintiff stated the price at which the plaintiff proposed to invoice the cement, and that it would pay for the bags at the rate of 10 cents each when returned, “subject to revision in event that a different price is agreed upon either between ourselves or the Portland cement committee and the War Industries Board.” The Navy Department’s answer to this letter stated that the cement should be invoiced at the price stated in the contract, but that—
“The question of increased unit price due to advance in freight rates or an increased price agreed upon by the War Industries Board and approved by the Secretary of the Navy, will be made the subject of an amendment to this contract and all deliveries made that are subject to such increase will be adjusted later.”
The contents of the letters of May 1 and May 4, 1918, are of importance not because they constitute any part of the preliminary and collateral contract, for these letters were written subsequent to the time when contracts No. 34650 and No. 35890 were executed, but because they show very conclusively how the parties to the action understood and construed the preliminary and collateral agreement which preceded the contracts with the numbers specified.
How the plaintiff understood the communications received from the Government officials is also quite clear from the letters written the Government officials on behalf of the plaintiff, as will be seen from an examination thereof. We have already called attention to the fact that on May 1, 1918, plaintiff wrote defendant that the price of cement stated in its invoices was subject to revision “in the event that a different price is agreed upon either between ourselves or the Portland Cement Committee and the War Industries Board.” The answer to this communication, while requiring the price of the cement to be invoiced as in the written agreement which both parties had signed, stated that the matter of *710 increased price either on the cement itself or by reason of increased freight rates, when “agreed upon by the War Industries Board and approved by the Secretary of the Navy, will be made the subject of an amendment to this contract [No. 34650] and all deliveries made that are subject to such increase will be adjusted later.” These two letters show that both parties understood that the prices stated in the written contracts were tentative only, and their subsequent action was in accordance with this understanding.
Pursuant to the plan outlined in the letter of the Secretary of the Navy and the understanding between the parties as shown by the communications to which we have referred, in the years 1917 and 1918 the price of cement to the Government was fixed by boards and price-fixing committees appointed by the President, or under his authority. The application of the prices so fixed will be considered further on in this opinion. We have been considering only whether there was a preliminary contract, which was entirely independent of the written contracts signed by both parties which provided that plaintiff should furnish cement to defendant at certain prices. With reference to this question we think it clear that the evidence shows that the defendant in effect proposed to plaintiff that if plaintiff would execute contracts to furnish the Government cement, the prices named therein would be subject to adjustment in accordance with the prices and terms subsequently fixed by the price-fixing committee for the purchase of cement by the Government. We have no doubt one party may propose to another that, if the other executes a contract, certain terms therein may be subject to definite changes upon the happening of certain conditions; and if the proposal is accepted by execution of the contract, the collateral agreement becomes legal and binding upon the parties. The consideration for the collateral agreement is, in this event, the action of the plaintiff in executing the written contracts signed by both parties.
Much is said in argument on both sides with reference to the extent which parol evidence may change or vary a written contract, as to what circumstances will justify reformation, and as to the necessity of a consideration for the contracts supplemental to contract No. 34650. In our view of the case, *711 tbis argument is not applicable. The proposal that was made on behalf of the defendant was in writing, and what little oral evidence has been received in connection therewith has been merely for the purpose of explaining its meaning. No reformation of the written contracts is necessary. They were made subject to a contingency, and upon the happening of the contingency the collateral agreement went into effect. Nor is there any need of a consideration for the contracts supplemental to contract No. 34650. Conceding arguendo that as new contracts they are not valid for want of a consideration, nevertheless they may be considered as showing the construction which the parties themselves placed upon the original proposal of the defendant which culminated in the collateral contract. The statements contained in the supplemental contracts are a recital of the effect of the collateral agreement and a declaration made by both parties as to how the contract would be construed by them.
As before stated we have mentioned the letter of May 1, 1918, of plaintiff to defendant and the reply thereto, not as constituting any part of the preliminary and collateral contract, for they were written after the execution of both contracts, No. 34650 and No. 35890, but as showing how the parties understood and construed the collateral agreement. This collateral agreement was made more explicit as to details by public statements issued by the War Industries Board.
Finding V shows that under date of January 31, 1918, the War Industries Board promulgated a schedule of prices for the purchase of Portland cement, and on May 6, 1918, another schedule of prices was fixed for Portland cement, and that both of these schedules were approved by the Secretary of the Navy, and the Paymaster General was directed to place orders accordingly. These schedules were not only made public, but the cement committee representing the manufacturers of cement, including plaintiff, was advised thereof. The statement in the second supplemental contract that the price stated in the original contract would be changed to $2.18 f. o. b. Northampton, Pa., and that freight charges between Northampton, Pa., and destination would be added to the face of the invoice as a separate item but freight charges were to be prepaid to destination, is only *712 a repetition of the price and the terms stated in the schedule of May 6, 1918, which applied for the four months ending August 31, 1918. In making payment in accordance with the second supplemental contract the defendant was merely complying with the terms of the collateral agreement. As we have held this collateral agreement to be valid, the defendant is not entitled to recover the sum so paid. The situation with reference to the first supplemental contract is based upon the statement contained in the schedule of May 6, 1918, that the prices named therein were “subject to increase in destination prices in accordance with any increases which may be made in freight rates and the war tax on same.” An increase having been made in the freight rates, the Government was bound to pay the amount of this increase and is entitled to no recovery thereon. The defendant therefore has failed as to both of the items of its first counterclaim.
DEFENDANT’S SECOND COUNTERCLAIM
By the second counterclaim the defendant seeks to recover $600.40, which is said to be due under a clause in the second supplemental contract to contract No. 34650 and dated September 1, 1918. By this provision plaintiff agreed to pay ten cents per bag for the cloth bags when returned, and defendant alleges that the Navy Department returned to the plaintiff 24,000 empty cloth bags between June 1 and July 30, 1918; that plaintiff paid for 17,996 bags, but refused to pay the Government for the remaining 6,004 empty bags at the agreed price of ten cents each.
As above stated, this agreement to pay ten cents per bag for each cloth bag returned, upon which defendant relies, was contained in the second supplemental contract to contract No. 34650. This supplemental contract defendant claims is invalid so far as agreements made on behalf of the defendant are concerned, but it contends that the promise made by the plaintiff to pay for the bags can be separated from the rest of the contract and held valid. We have not found it necessary to determine whether the whole of this instrument was enforceable as a contract on the part of the defendant. Passing over that question, we have held it to *713 be admissible as showing the construction placed by both parties on a prior agreement collateral to contract No. 34650. It should be said, however, in this connection, that the contention of the defendant is based on a claim that there was no consideration for its agreement expressed therein, and if we found it necessary to pass on this question we should be inclined to hold that the agreement made with reference to the cloth bags on behalf of the plaintiff constituted a sufficient consideration, as nothing was said on this subject in the original contract No. 34650.
On the question of enforcement of the contract to pay for the cloth bags, plaintiff contends that if any part of the supplemental contract is invalid it must all be invalid and of no force and effect. This raises another question which it is not necessary to determine. Conceding for the purposes of the argument that the provision with reference to the payment for the cloth bags is valid and enforceable as against the plaintiff, we are of the opinion that it applied only to cement shipped on and after May 1, 1918. In fact, it begins with the statement that—
“On all shipments of Portland cement on and after May 1, 1918, * * * the price applying to original contract No. 34650 will be changed to $2.18 f. o. b. Northampton, Pa.”
The supplemental contract then proceeds to further prescribe the manner of shipments, what shall be done with freight charges, and other matters pertaining to the shipment, among which is the provision with reference to payment for the cloth bags inserted in the same manner as the provision with reference to price. We think that on the face of this supplemental contract, the material part of which is set out in Finding VI, and which it will be remembered was dated September 1, 1918, there is sufficient to show that in all of its provisions it was intended to apply only to shipments of cement made on and after May 1, 1918. This conclusion is strengthened by the schedule of prices issued by the price-fixing committee and dated May 6, 1918, which fixed the prices of cement for the four months ending August 31, 1918, and which provided that credit should be given “to the department * * * at the rate of ten cents (10;/:) each for * * * empty cloth bags” returned in service *714 able condition “within sixty days from date of receipt of shipment of cement,” and also the letter of plaintiff to the pay director of the Navy dated May 1, 1918, in which it stated with reference to the remainder of cement to be shipped on contract No. 34650 that it would pay for the sacks at the rate of “ 10(4 each for all sacks received in good order, freight prepaid,” evidently meaning the sacks of the remainder of the cement. Prior to May 1, under the price schedule announced by the War Industries Board, bags not returned freight prepaid were to be “paid for at 15 cents each” by defendant, but if bags received before that date were returned the plaintiff merely received back its own property and was not required to pay for them.
Plaintiff does not dispute the return of the bags, as alleged by defendant in its second counterclaim, but has refused to pay for the 6,004 bags in controversy solely on the ground that they contained cement shipped prior to May 1, 1918, as shown by the evidence. Holding, as we do, that the price schedule announced by the War Industries Board on January 31, 1918, fixed between the parties the terms with reference to sacks in connection with the cement furnished, and that the provision with reference to payment for sacks contained in the second supplemental agreement and relied upon by defendant applied only to sacks shipped after May 1, it follows that defendant is not entitled to recover on its second counterclaim.
DEFENDANT’S THIRD COUNTERCLAIM
The contract of March 30, 1918, designated as No. 35890, provided that the plaintiff should furnish and deliver 5,000 barrels of cement in cloth bags; 15,210 empty bags that had contained cement shipped under the contract were not returned to the contractor, and the disbursing officer of the Navy Department, on October 13, 1918, paid the plaintiff for the same at the price of 15 cents each, totaling $2,281.50, which the defendant seeks to recover, together with interest thereon. After this payment plaintiff and the Paymaster General of the Navy entered into a contract dated May 19, 1921, purporting to be supplemental to contract No. 35890 of March 30, 1918, which recited that the price mentioned in the last-named contract was the price to cover the *715 cement only and that it was the regular commercial practice that when cement was delivered in bags the bags remained the property of the contractor when it was not otherwise provided in the contract or agreement, and further that the object of the supplemental agreement was to justify the payment of the said sum of $2,281.50.
It is urged on behalf of defendant that this supplemental contract was without consideration and could not vary the terms of the original contract No. 35890. With this contention we agree, and think that the instrument denominated a supplemental contract had no contractual force or effect. It may, however, be received as evidence of an admission of a trade custom in construing the original contract. The rule is that general and universal customs applicable to the trade or business are binding upon buyer and seller unless there is a notice or contractual stipulation that the transaction is without regard to the custom, 17 C. J. 490, sec. 54; and evidence of usage is competent for the purpose of showing in cases of sales in whom is the ownership of casks or other containers. Idem, citing authorities. But the defendant contends that this rule applies only where the contract is ambiguous. With this contention we also agree, with the additional statement that it is applied when the contract is silent on the subject. The contract under consideration is clearly ambiguous at least, and it might well be argued that it contained no provision whatever as to whether the seller or the buyer should own the sacks after the delivery of the cement. What the plaintiff sold and agreed to deliver was cement, not sacks, and evidence of the custom of the trade is admissible to show the ownership of the sacks after the cement had been delivered. By the supplemental contract defendant admitted that the custom was that the bags should remain the property of the contractor unless otherwise provided in the contract. This custom did not fix the price of the sacks if not returned, but contract No. 35890, dated March 30, 1918, was made under the same conditions as contract No. 34650, which we have already discussed. On January 31, 1918, the War Industries Board issued a schedule of prices of cement which the Secretary of the Navy approved and directed the Paymaster General to place orders accordingly. Along with the prices of cement in *716 various towns was a statement to the effect that no charge should be made for cloth bags at the time of shipment, but bags not returned to the point of shipment in good condition, freight prepaid by the purchaser, within sixty days from the date of shipment, would be paid for at 15 cents each. The evidence leaves no doubt that all of these schedules of prices and terms upon which cement would be purchased by the Government were presented to a cement committee representing the manufacturers of cement, including the plaintiff. The plaintiff shipped on orders from the Government the greater part of the cement covered by the contract of March 30, 1918, before that contact was executed. While the contract is dated March 30, 1918, it was not actually received by the plaintiff until April first, and at that time the plantiff had shipped all but 5,804 bags out ot the 20,000 bags to be shipped under the contract. It is quite clear that the plaintiff was relying upon assurances given it by the Government agents that it would be paid for the cement in accordance with the prices and terms fixed by the War Industries Board and the price fixing committee. When it accepted the order and began shipments of the cement, a contract was created between it and the Government that it would receive these prices for the cement and be paid for the bags in accordance with the terms of the schedule. Consequently, defendant can not recover any of the money so paid and must fail on its third counterclaim.
It should be noted with reference both to payments by the plaintiff to defendant for bags and payments by the defendant to plaintiff on account of the same, that, while there had been a dispute as to the number of bags returned on the several contracts, this dispute had been settled through a conference between a representative of the plaintiff and the Government in which the number of bags to be allocated to each contract was agreed upon, and there is now no controversy in relation to this matter.
lefenbant’s fourth counterclaim
During July and September, 1925, the Navy Department returned to the plaintiff 2,600 empty cloth bags under contract No. 62,473. Plaintiff acknowdedged receipt of 2,553 *717 bags and credited the Government with the sum of $255.30. Seven of the 2,600 bags were in bad condition. The defendant is entitled to recover $255.30 on this counterclaim.
ADDITIONAL CLAIM OF DEFENDANT
In addition to the amounts specified in the counterclaims above referred to, the defendant seeks to recover $404 for 4,040 bags returned by the defendant to the plaintiff, for which it agreed to pay 10 cents each under another contract. The plaintiff does not dispute this item — in fact the evidence shows that the defendant was given credit by plaintiff in the amount of $404 — but as this claim was not mentioned in the pleadings, plaintiff contends that it is not an issue herein and that defendant can not be allowed anything thereon as against plaintiff’s claims. We do not agree. The forms of pleadings in this court are not of so strict a character as to prevent the allowance of a debt justly due the defendant from the plaintiff as against any sum found due from defendant to plaintiff even though there is no plea thereof. Wisconsin Central R. R. v. United States, 164 U. S. 190, 212, and cases cited therein. In making up the judgment in the case at bar the defendant will be credited with $404 on account of this additional claim.
In determining the amount of judgment to be rendered herein it will be observed that the claim of plaintiff for $6,530.51, as set out in its petition, is not disputed, and that defendant is found to be entitled to recover only on its fourth counterclaim for $255.30 and its additional claim for credit of $404, a total of $659.30. Assuming, as we think we may, that there was an open account between plaintiff and defendant until payment was refused on plaintiff’s claim by the Comptroller General, the total of these two items allowed defendant should be deducted from the amount due plaintiff under the two contracts upon which suit was brought. This leaves $5,871.21 due plaintiff as a balance on account. Payment of plaintiff’s claim having been refused by the Comptroller General on account of offsets which we have held to be unfounded, the statute of 1875 with reference to the matter of interest would apply. See Standard Dredging Co. v. United States, No. D-40, decided by this court December 1, 1930 [71 C. Cls. 218]. Plaintiff’s petition, *718 however, asks for interest only from the date of judgment, and we are thereby precluded from granting interest from an earlier date. Judgment will be rendered for plaintiff for the sum of $5,871.21 with interest from the date of rendition thereof. It is so ordered.
Whaley, Judge; Williams, Judge; Littleton, Judge; and Booth, Chief Justice, concur.
By order of the court May 2, 1932, the second paragraph of Finding XIII was amended to read as follows:
“The Navy Department also returned 1,444 bags under another contract, which bags were received by plaintiff, and the Government was given credit for the sum of $146.90.”
The last sentence of the first paragraph of Finding XIV was amended to read:
“On April 23, 1927, the Comptroller General issued a certificate of settlement in which $4,675.42 was allowed plaintiff on contract No. 62473, and on the contract dated December 3, 1925, $1,900, and for bags returned under contract No. 34650, $1,799.60, but by reason of set-offs made against these allowances found that there was due from plaintiff to defendant the sum of $804.91, and accordingly payment of the amounts so allowed to plaintiff was withheld.”
The court thereupon decided that plaintiff, after deducting set-offs in favor of defendant in the amount of $402.20, was entitled to recover $6,128.31, with interest at six per cent per annum from April 23, 1927, to date of payment.
With the order was filed the following
memorandum by the court
Plaintiff has filed a motion to correct the figures in the second paragraph of Finding XIII and to change the judgment in accordance with the corrected figures. Plaintiff also has filed a motion for leave to amend its petition and ask for interest and to include interest in the judgment. Defendant has filed a motion to change the findings and for a new trial.
The plaintiff’s motion to correct the figures in the second paragraph of Finding XIII is sustained and the finding corrected as shown in the order. The judgment also will be changed to correspond with the change in the figures of the finding, but it should be observed that plaintiff, in stating the amount for which judgment should be rendered, takes no *719 account of defendant’s fourth counterclaim which is allowed as an offset subject to the correction. Plaintiff’s motion for leave to amend its petition and ask for interest is also sustained, and judgment will be awarded for interest from the time when payment of the uncontested claim of plaintiff was withheld by the Comptroller General on account of set-offs made against the said claim, which set-offs have not been sustained by the court. In order that the findings may definitely show the date at which the court finds such payment was withheld an amendment is made to Finding XIV.
Defendant’s motion for change in the findings and for a new trial is overruled. Counsel for defendant misread Finding XI. The words “This contract” in the fourth sentence of that finding plainly refer not to contract No. 35890 but to the supplemental contract of May 19, 1921, last referred to before the words quoted.
The motion for new trial is based upon the contention that the court has permitted prior oral negotiations to modify the contract between the parties, but, as stated in the opinion, the contractual relations of the parties were determined wholly from the written evidence, and upon this written evidence the court drew the conclusion that a prior agreement had been made which applied to the subsequent written contracts which were made thereunder. The only use of any other evidence was for the purpose of determining the meaning of certain language used in written communications that passed between the parties.
The motions filed by the plaintiff having been sustained, the former judgment will be vacated and a new judgment entered in accordance with the rulings announced herein upon the filing by plaintiff of the amendment to its petition to which reference is above made.