**AVIATION CONTRACTOR EMPLOYEES, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**No. 91–1012.**

United States Court of Appeals, Federal Circuit.

Oct. 4, 1991.

---

James N. Walter, Jr., Capell, Howard, Knabe & Cobbs, P.A., Montgomery, Ala., argued for appellant; Herman H. Hamilton, Jr., on the brief.

J. Peter Mulhern, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for appellee; Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and James M. Kinsella, Asst. Director; Major Raymond M. Saunders, Trial Atty., Arlington, Va., of counsel, on the brief.

Before RICH and NEWMAN, Circuit Judges, and SMITH, Senior Circuit Judge.

RICH, Circuit Judge.

Aviation Contractor Employees, Inc. (ACE) appeals from the May 16, 1990 decision of the Armed Services Board of Contract Appeals (Board) in Appeal Nos. 30154 and 33054, denying in part ACE's request for an equitable cost adjustment. We affirm-in-part, vacate-in-part, and remand.

## BACKGROUND

ACE was awarded Contract No. DABT01–82–C–0300 (the contract) to provide flight training for student pilots at Fort Rucker, Alabama. The contract required ACE to provide those services during fiscal year (FY) 1983, and also contained an option clause giving the government the right to renew the contract, on an annual basis, for up to a total of five years. The government chose to exercise its option for FY 1984 and 1985, and ACE performed satisfactorily under the contract for all three years.

The contract price for FY 1983 was set at $16,089,034. However, the contract contained no detailed pricing for any period other than FY 1983. At issue here is how the contract price should be calculated for option years 1984 and 1985.

### The FY 1984 Extension

The contract contains several standard clauses which are relevant to how the contract should be priced during the option years. One of these is the standard Changes Clause (Defense Acquisition Regulation (DAR) 7–1902.2), which provides for adjustment of the contract price upon changes in the scope of work required of the contractor. The second is the Fair Labor Standards Act and Service Contract Act—Price Adjustment Clause (DAR 7–1905(b)), which provides for adjustment of the contract price based on changes in the cost of wages and benefits to certain employees. In the context of this case, DAR 7–1905(b) provides that ACE is entitled to an adjustment in contract price to reflect increased wages and benefits to those employees covered by the union Collective Bargaining Agreement (CBA). ACE's managerial and supervisory personnel are *not* covered by the CBA.

Shortly after the government exercised its option for FY 1984, ACE submitted cost proposals for performance that year. The proposals included increased costs not only for the items covered by DAR 7–1902.2 and 7–1905(b), but also for wage and benefit increases for supervisory employees *not* covered by a collective bargaining agreement, increases for aircraft liability insurance, increases in rates for state unemployment insurance and workers' compensation, and additional profit. The government contracting officer (CO) rejected ACE's proposals, taking the position that cost increases in the contract awards for the option years should be limited to wage and benefit increases pursuant to DAR 7–1905(b) and changes in the scope of work under the contract. ACE eventually filed a certified claim for $1,093,137, representing ACE's calculation of the increased cost of items other than those based on changes in the scope of work and those based on DAR 7–1905(b).

While conceding that the contract did not explicitly require adjustment of the contract price based on these additional items, ACE reasoned that the items should be paid for by the government due to the government's failure to adequately clarify the method of pricing the option years. ACE pointed to "evasive" answers the government had previously given to pricing-related questions of prospective contract bidders at a pre-bid conference held in 1982, and argued that any dispute arising from the lack of clarity in the government's answers should be resolved against the government. Notably, the bidders' questions and the government's answers thereto were incorporated into the contract solicitation as follows:

Q: At the pre-bid conference you stated that page 128 of the IFB (Fair Labor Standards Act and Service Contract Act) would be used to price extensions of the basic contract, yet this includes no provisions for wage or fringe benefits increases for any personnel other than those included in the then current wage determination. Since the Solicitation contains no provision for bidders to price the option years, what method may be used to provide salary increases to other than wage determination personnel that would be acceptable to the Army?

A. The prospective bidders are again urged to contact the Department of Labor concerning any interpretation and definition of the Wage Determination.

Q. In the event that any options are exercised, will they:

a. Be as IFB's or RFP's?

b. If RFP's will they be negotiated or be a declaration by the CO?

A. The answers to both parts of the question are that any exercise of an option will be handled in accordance with contract provision H1., page 120 of 141 and DAR Section I, Part 15, OPTIONS.

In response to ACE's claim, the CO disallowed the additional cost increases. ACE appealed to the Board, which affirmed the CO's position that "the price escalations for the option years were limited to that set forth in DAR 7–1905(b) and due to increases in the work." Underlying the Board's conclusion was the fact finding that

Mr. Farner [for ACE] was well aware of how the Government intended to price options in contracts subsequent to contract 0269,[1] notwithstanding his protestations to the contrary, based upon the credible testimony on that subject by Mr. Bullock and Mr. Cunningham.

*The FY 1985 Extension*

The issue with respect to the pricing of the contract for FY 1985 focuses on the meaning and enforceability of bilateral contract modification P00041 (Mod 41) thereto. When the government indicated its desire to exercise its option for FY 1985, the dispute was still ongoing concerning which factors should go into determining adjust-

---

1. The Board's Finding of Fact 21 is that Fred Farner, president of ACE, was vice president of DASI [Doss Aeronautical Services, Inc., which had been awarded the same flight training contract in FY 1981] during perform-
ance of the FY 1981 contract (contract 0269) and was authorized to negotiate modifications on behalf of DASI. Contract 0269 contained an option clause essentially the same as in the instant contract....

ments of the contract price. A meeting was held between CO Bullock and Farner in September, 1984, at which both parties demonstrated a desire to preclude further claims. Bullock expressed his willingness to consider "all FY 85 costs" and not solely those related to DAR 7–1905(b). On or about September 18, 1984, ACE submitted a cost proposal for FY 1985 which included all of its increased costs, resulting in a proposed contract price of $20,454,502. About 10 days thereafter, on September 28, 1984, Bullock and Farner executed Mod 41 which states in part:

> WHEREAS, the Contractor was directed by Modification P00035 to extend performance of contract DABT01–82–C–0300 for the period 84 OCT 01 through 85 Sep 30 (FY 85); and,
>
> WHEREAS, both parties have agreed to negotiate a contract price based upon Modifications P00035, P00039 and P00040 and the cost proposal submitted based on the requirements contained therein; and
>
> WHEREAS, both parties agree to treat FY 84 as an entity with outstanding unresolved claims, with the Contractor reserving all rights to these claims; and
>
> WHEREAS, both parties agree to treat FY 85 as an entity with commencement of the contract to be by mutual agreement and the contract price to be definitized at a later date by negotiation;
>
> NOW THEREFORE, the contract price is established at $19,000,000, subject to increase or decrease based upon completion of the aforementioned negotiations.

However, when Bullock was thereafter replaced by a new CO, Jennings, no such negotiations for FY 1985 took place. Instead, the government said that it would not honor Mod 41 because its execution was beyond Bullock's authority. Jennings later "definitized" the contract price at $18.954 million, which was less than ACE would have gotten under Mod 41.

ACE sought to enforce Mod 41 before the Board. The Board disagreed with ACE, although not on the "lack of authori-

ty" argument put forward by the government, finding instead that Mod 41 was

> an agreement merely to negotiate a price—without establishing what cost factors would be considered. Thus, to the extent the modification refers to costs which will be recognized, it is legally unenforceable due to uncertainty. [Citations omitted.]

This appeal followed.

## OPINION

### A. *FY 1984*

Under this court's scope of review, the Board's conclusions of law are not final and thus are freely reviewable, while with respect to the Board's findings of fact, our review is limited to a determination of whether those findings are arbitrary, capricious, based on less than substantial evidence, or rendered in bad faith. 41 U.S.C. § 609(b) (1988); *American Elec. Labs., Inc. v. United States,* 774 F.2d 1110, 1112 (Fed.Cir.1985).

ACE argues that the Board erred in its interpretation of the contract as restricting option year price adjustments solely to (1) labor cost increases required by DAR 7–1905(b) and (2) increases in the scope of work. ACE contends that the language of the contract is unclear and ambiguous with respect to pricing of option years, and that the contract should therefore be construed against the drafter, in this case the government. ACE also contends that once the uncertainties concerning option year pricing was raised by the bidders, the burden shifted to the government to adequately clarify those uncertainties.

However, in the present case, the Board found that while the government's answers to the questions posed by the bidders were "somewhat evasive," those questions and answers (quoted above), "clearly put bidders on notice that the government intended to restrict option pricing to the increases allowed by DAR 7–1905(b) and by reason of increases in the work."

The Board further found that Farner, through his earlier experience with contract 0269 in FY 1981, was "well aware" of

how the government intended to price options subsequent to contract 0269. This second finding was based specifically on credibility determinations of witnesses who testified before the Board.

While ACE disputes these fact findings, we see no basis under our limited scope of review to upset them. In view of these facts, especially the finding that ACE's president had knowledge of how the government previously priced the option years and intended to continue to do so, we agree that ACE cannot now claim that the contract should be interpreted otherwise. We affirm the Board with respect to FY 1984.

## B. *FY 1985 and Mod 41*

### 1. *Definiteness*

 The requirement for certainty in contracts serves two purposes. One is the need to determine whether the parties in fact intended to contract at all, and the other relates to the ability of a court to determine when a breach has occurred and to formulate an appropriate remedy. *See Restatement (Second) Contracts* § 33 (1981) (hereinafter *Restatement*); *Neeley v. Bankers Trust Co. of Texas,* 757 F.2d 621, 627 (5th Cir.1985); *Brookhaven Housing Coalition v. Solomon,* 583 F.2d 584, 593 (2d Cir.1978).

In the present case, there is no question that the first purpose is met by Mod 41. Leaving aside for now the question of CO Bullock's *authority* to modify the contract by entering into Mod 41, it is clear that he *intended* to so modify the contract. As the Board found (Finding of Fact 62):

> [B]ased upon our review of the record as a whole, we adopt the ACE view that Mr. Bullock and Mr. Farner intended to negotiate the contract price for FY 85 without regard to the year end price for FY 84 and their intentions were fully set forth in Modification P00041.

However, the Board then went on to conclude that Mod 41 was "an agreement merely to negotiate a price—without establishing what cost factors would be considered." Thus, the Board was apparently concerned with the second requirement; i.e., that there was no reasonable way a court could tell if Mod 41 was breached or what an appropriate remedy would be.

 As Professor Corbin has noted, once it is determined that the parties did indeed intend to create a contract, courts should be slow to deny enforcement on the basis of indefiniteness in the contract. 1 A. Corbin, *Corbin on Contracts* § 97 (1963) (hereinafter *Corbin*). With this principle in mind, we are convinced that under the facts of this case, Mod 41 is not so indefinite that it cannot be enforced.

 First, while some courts have invalidated so-called "agreements to agree," the emerging view is that an agreement which specifies that certain terms will be agreed on by future negotiation is sufficiently definite, because it impliedly places an obligation on the parties to negotiate *in good faith. See Corbin* at § 97 (1990 Supp.); *Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 454 (2d Cir.1977). Such an obligation gives the contract certainty by allowing the courts to determine when a breach has occurred by determining whether the parties have negotiated in good faith. In the context of the present case, it is manifestly clear to us that the government has *not* negotiated in good faith, as the government has been unwilling to negotiate *at all.* Instead, the government in effect has *repudiated* Mod 41, as evidenced, for example, by the Board's Finding of Fact 60, which quotes a letter, written by CO Jennings for her supervisor's signature, addressed "to officials higher in her chain of command," which stated that in view of the circumstances surrounding this contract,

> Mrs. Jennings believes that it is in the best interest of the Government *to honor the agreement* and price out FY85 as a separate contract year. [Our emphasis.]

Furthermore, we cannot agree with the Board that there was no indication of what cost figures were to be considered under Mod 41. In fact, it is clear from the fact findings made by the Board that *both parties* knew reasonably well after Mod 41

what costs were to be taken into account in pricing FY 1985. Most importantly, Mod 41 itself specifically refers to an agreement to negotiate a contract price based upon, *inter alia,* the "cost proposal submitted *based on the requirements contained therein"* (our emphasis). This cost proposal, which was submitted approximately 10 days before the execution of Mod 41, calculated the contract price on the basis of *all cost increases.*

Further, the Board found that CO Bullock, in a meeting two weeks before the execution of Mod 41, expressed his willingness to consider "all costs" in negotiating a contract price for FY 1985. In fact, notes taken during that meeting by Bullock's assistant show that the parties were not that far apart in settling on a price based on all costs. The notes indicated that:

> Different pricing procedure this year, FY '85, th[a]n last. Major changes [in specification] plus [7–1905(b)] changes, two to one vis a vis three to one, as bid. 30 September '84 is the starting point.... *Negotiate a total performance price for FY '85.* Contractor is to submit a total price to perform.... Contractor and Government are less than one million dollars apart and *I see no reason why we cannot agree on a price.* Now, I approve 17.3 million. Will go to 19.8 to 20.1 million.... [Our emphasis, brackets in original.]

Then on September 27, 1984, *the day before executing Mod 41,* Bullock requested an audit of ACE's FY 1985 cost proposal by the Defense Contract Audit Agency (DCAA). Bullock had made such requests before, but had always advised DCAA to limit its review to increases based on DAR 7–1905(b) and changes in the scope of work. However, Bullock's September 27 letter stated as follows:

> Due to specification changes made in the contract operation incorporated in Modifications P00039 and P00040, and the programmed student load as stated in Modification P00035, the Contractor has been

requested to furnish a *complete cost proposal* for the contract operation for FY 85. *This would then be a different definitization of price than was used for FY 84.* [Our emphasis].

Thus, the circumstances surrounding the execution of Mod 41 clearly show that the parties intended that *all* of ACE's costs should be taken into account in pricing FY 1985.[2] This relieves the Board's concerns with respect to determining the *amount* of a remedy, for once the factors that are to go into determining a contract price are determined, a trial court or comparable agency Board is well suited to determine what a reasonable price would be. When a contract indicates a clear intention by both parties to be bound but leaves the price indefinite, the court can enforce the contract by determining a "reasonable" price. *See Neeley,* 757 F.2d at 627–28; *Lee,* 552 F.2d at 453; *Corbin* at § 97; *Restatement* at § 33, comment e.

### 2. *Consideration*

The government does not deny that CO Bullock had general authority to bind the government with respect to the contract at hand. Its sole basis for arguing that Bullock was without authority to enter into Mod 41 is that the government received *no consideration* in return for agreeing to renegotiate the contract price on the basis of additional cost factors. Numerous decisions of one of this court's predecessors, the Court of Claims, indicate that government officers lack authority to enter into contracts under which the government receives nothing. *See, e.g., Flippin Materials Co. v. United States,* 312 F.2d 408, 417, 160 Ct.Cl. 357 (1963); *Vulcanite Portland Cement Co. v. United States,* 74 Ct.Cl. 692, 705 (1932); *Burke & James, Inc. v. United States,* 63 Ct.Cl. 36, 57, *cert. dismissed,* 274 U.S. 764, 47 S.Ct. 660, 71 L.Ed. 1328 (1927). The Board, having found Mod 41 unenforceable due to indefiniteness, did not reach the consideration issue. However,

**2.** In fact, the government never contended, either at the CO level or before the Board, that it did not know what was intended by Mod 41. Instead, as noted above, the government's position has been that they *would not honor* Mod 41 because it was outside of Bullock's authority to enter into such a modification.

**1574**

the government raises the issue before us as an alternative basis for upholding the Board's decision.

One treatise discusses the problem of lack of consideration in government contracts as follows:

> In Government contracts, [lack of consideration] most often occurs when the Government modifies a contract to benefit the contractor but receives no additional or different promise or performance in return. Under Restatement, Second, Contracts § 73 (1981), such modifications are without consideration since they involve performance of a pre-existing duty *which is neither doubtful nor the subject of honest dispute.* [Our emphasis.]

J. Cibinic & R. Nash, *Formation of Government Contracts* 189 (2d ed. 1986). The essence of the government's argument is this: that ACE was already under an obligation to perform under the contract in the option years at a price which included adjustments based only on DAR 7–1905(b) and changes in the scope of work. Thus, the government contends, under the "pre-existing duty rule," ACE gave no consideration in return for the government's agreement to adjust the contract price based on other costs.

The flaw in the government's argument is that it overlooks the critical requirement, contained in the last portion quoted above, that the duty be "neither doubtful nor the subject of honest dispute." The whole reason why Mod 41 was entered into was to settle the ongoing dispute between the government and ACE concerning what costs should go into calculating the contract price during the option years. Although the Board's decision, as well as the present decision, have *now* established that the government's position in this dispute was the correct one (i.e., that the contract required price adjustments based only on DAR 7–1905(b) and changes in the scope of work), that does not mean that a settlement of that dispute *at the time Mod 41 was entered into* cannot constitute consideration. *See Restatement* at § 74(1).

Of course, the pre-existing duty must be the subject of "honest dispute," or in other words, the parties must hold their positions in good faith. In the present case, the fact, found by the Board, that Farner was "well aware of how the government intended to price the options in contracts subsequent to contract 0269," may weigh against a finding that ACE acted in good faith in negotiating Mod 41. However, the Board made no specific finding on the issue. Therefore, we must remand to the Board for a finding concerning ACE's good faith in this regard.

ACE also argues that consideration exists for Mod 41 because as part of Mod 41, they agreed not to bring any claims for additional compensation relative to FY 1983 and FY 1985. While such an agreement is not manifested by the language of Mod 41, there are indications both in the Board's findings and in various inter-party and intra-party communications of record that such an agreement was made. Such an agreement would constitute valid consideration for Mod 41. Again, no clear fact finding was made by the Board as to whether this agreement was, in fact, made or merely contemplated. Therefore, we also remand for such a finding.

## CONCLUSION

The decision of the Board with respect to FY 1984 is *affirmed.* The decision with respect to FY 1985 is *vacated* insofar as it held Mod 41 to be invalid as indefinite and unenforceable. The case is *remanded* for (1) findings relating to the adequacy of ACE's consideration in entering into Mod 41, and (2) for a decision based upon those findings, consistent with this opinion.

## COSTS

Each party to bear its own costs.

AFFIRMED–IN–PART, VACATED–IN–PART, and REMANDED.