**GARDINER, KAMYA & ASSOCIATES, P.C., Appellant,**

v.

**Alphonso JACKSON, Acting Secretary of Housing and Urban Development, Appellee.**

No. 03–1235.

United States Court of Appeals, Federal Circuit.

DECIDED: May 27, 2004.

 

Philip M. Musolino, Musolino & Dessel, of Washington, DC, argued for appellant.

Cristina C. Ashworth, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With her on the brief were Peter D. Keisler; Assistant Attorney General; David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel on the brief was Kenneth M. Hyde, Attorney, Office of General Counsel, Department of Housing and Urban Development, of Washington, DC.

Before MAYER, Chief Judge, CLEVENGER and GAJARSA, Circuit Judges.

MAYER, Chief Judge.

Gardiner, Kamya & Associates P.C. ("GKA") appeals the decision of the Department of Housing and Urban Development Board of Contract Appeals holding that a contract modification was not enforceable to retroactively reprice past performance of certain task orders. *Gardiner, Kamya, & Assoc. P.C.*, HUDBCA No. 00–C–104–C5 (Nov. 27, 2002). Because the board erred in concluding that the modification lacked consideration, we reverse and remand.

### Background

On March 11, 1993, the Department of Housing and Urban Development ("HUD") and GKA entered into Contract Number DU100C000018170, an indefinite delivery, indefinite quantity ("IDIQ") agreement. The contract was awarded pursuant to the Small Business Administration Section 8(a) Program, and it required GKA to provide a broad range of services, including review and analysis of mortgage insurance claims to ensure the integrity of HUD's Single Family Mort-

gage Insurance Program. Contract services were to be procured through specific task orders. Under the contract, HUD agreed to order a minimum of $2,000,000 in services up to a maximum of $28,000,000.

The contract work requirements, delivery schedule, funding arrangements, and travel requirements for each task order would be negotiated separately. The scope of work provision of the contract provided:

> The work to be performed shall be accomplished through task orders issued by the Contracting Officer or designee. Such task orders shall specify the work to be performed, level of effort, period of performance and deliverable items required.

According to the contract, various labor categories and corresponding hourly pay rates were to be negotiated separately and agreed upon in the individual task orders. For instance, the contract identified six types of claims reviews on defaulted loans. During the contract period GKA and HUD negotiated the level of effort, which was determined by an evaluation of the number of labor hours needed to perform each type of review. Labor rates were applied to the agreed upon levels of effort for each type of claims review to calculate the contract price for each type of review performed under a task order. The levels of effort proposed by GKA and agreed to by HUD for each type were based on estimates of the hours of work that it would take to perform the task order services. These estimates were derived from the estimated hours used for the same types of claims reviews in a predecessor contract between HUD and Irvin Burton & Associates ("Burton"). GKA relied on the Burton estimates for Task Order 1, which was awarded by HUD for a one-year period on September 13, 1993. Subsequently, HUD

awarded GKA Task Order 5 for a one-year period to perform the claims reviews that had been covered by Task Order 1. The same levels of effort that had been agreed upon for Task Order 1 were also agreed upon for Task Order 5, but the agreed prices for the types of review were lower.

On July 28, 1995, Delores Ammons–Barnett, one of three contracting officers for HUD, requested proposals from GKA for Task Orders 13 and 14. These task orders would cover the next period of claims reviews and follow-up reviews for fiscal year 1996. GKA's proposed prices for Task Orders 13 and 14 contained increases in price relative to previous task orders because GKA projected substantially higher labor costs. Janice Blake–Green, Chief of the Single Family Claims Branch in HUD, whose office was the customer for the GKA contract work, expressed concern over the steep increases in GKA's proposals. After further review, HUD concluded that the levels of effort proposed by GKA were too high. During negotiations in September of 1995, representatives of GKA and HUD met to work out the differing views about the levels of effort. After an audit by the Defense Contract Audit Agency ("DCAA") on January 18, 1996, GKA submitted a revised proposal substantially reducing both the levels of effort and the labor rates for each type of claims review. HUD agreed to GKA's February 5, 1996, revised proposal, and Task Orders 13 and 14 were signed by Annette Hancock for HUD and Christopher Gardiner, president of GKA. Gardiner and another official from GKA testified that prior to the acceptance of Task Orders 13 and 14, they met alone with Blake–Green and the parties reached an understanding that DCAA would conduct an audit of the actual work being done by GKA. GKA alleges that Blake–Green agreed to both retroactively and prospectively compensate GKA for the levels of effort actually found by

DCAA in its audit. HUD denies this, and it is undisputed that Gardiner did not advise any of the three contracting officers about the retroactive compensation arrangement.

During the fifteen month performance period for Task Orders 13 and 14, GKA recorded by task and person the work hours expended per review to show HUD and Blake–Green the levels of effort actually expended on the contract. Gardiner met with Blake–Green about 20 times over the fifteen month period to provide her with this documentation and to press her to request a DCAA audit of GKA's actual performance. An audit was never requested.

In the spring of 1997, when Task Orders 13 and 14 were about to expire, HUD advised GKA that it desired a six-month "no cost" extension of the two task orders. At the time, HUD was preparing to solicit a new "omnibus" contract that would replace GKA's contract, and it preferred to avoid any interruption in services in the interim. The no cost extension was unacceptable to GKA because it believed the levels of effort they required were too low, thereby adversely affecting price. In July of 1997, GKA representatives and a contracting officer convened in an attempt to reach an agreement on the terms of the extensions. Eventually, they arrived at the following agreement, which reads in pertinent part:

1. The period of performance is hereby modified to read:

"Twenty one (21) months from the effective date of award"

2. The contractor shall continue performance of the services required under this task order at the same "Unit Price Per Review" specified for the respective categories on Page 3 of the task order. Such prices shall remain in effect *pending results of the audit and subsequent negotiations of the unit prices.*

"Modification 2" to Task Orders 13 and 14 (emphasis added). Based upon this language, the board determined that GKA and HUD agreed to sign the extensions without an immediate price increase. More importantly, Modification 2 also provided for another DCAA audit, and the parties agreed to negotiate a price adjustment if the audit so recommended.

The parties had different understandings about the price term of the agreement reached during the July 1997 meeting. GKA believed that HUD had agreed to reprice all work under Task Orders 13 and 14, including work that had already been performed and for which it had already been compensated. Thus, according to GKA, Modification 2 would not only have prospective effect from July 1997 onward, but it would also have retroactive effect, back to the effective dates of the task orders. The board determined that HUD's representatives did not share the same understanding, instead believing that only the six-month extension period of the task orders would be subject to repricing based upon the DCAA audit because the disagreement concerned only the task order extensions.

A DCAA review of GKA's work was subsequently completed in December 1997. Although the audit was not what HUD had expected, it agreed to use the higher rates from the audit for purposes of repricing the extension period of the task orders. On July 15, 1998, GKA submitted a claim seeking to be reimbursed retroactively to March 11, 1996, the date of award for Task Orders 13 and 14. A contracting officer denied the claim, and GKA appealed the decision to the board on January 13, 2000.

The board held that there could not have been any express or implied agreement to reprice Task Orders 13 and 14

prior to July 1997 because no individual with contracting authority was present at any meeting during which such an agreement might have resulted. The board also concluded that no binding agreement to retroactively reprice the past performance resulted from the July 1997 meeting and the ensuing modifications. This appeal timely followed.

### Discussion

■ We have jurisdiction over an appeal from a decision of a board of contract appeals by virtue of 28 U.S.C. § 1295(a)(10). Under our scope of review, the board's conclusions of law are freely reviewable, while review of the board's findings of fact is limited to a determination of whether those findings are arbitrary, capricious, based on less than substantial evidence, or rendered in bad faith. 41 U.S.C. § 609(b) (2000); *American Elec. Labs., Inc. v. United States*, 774 F.2d 1110, 1112 (Fed.Cir.1985).

■ "To be valid and enforceable, a contract must have both consideration to ensure mutuality of obligation, *see generally* Restatement (Second) of Contracts §§ 71, 72 (1981), and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.' Id. § 33(2)." *Ace–Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed.Cir.2000). Performance of a pre-existing legal duty is not consideration. Restatement (Second) of Contracts § 73 (1981). "This court has recognized that a contract term which allows for future negotiation 'impliedly places an obligation on the parties to nego-

tiate in good faith.'" *City of Tacoma v. United States*, 31 F.3d 1130, 1132 (Fed.Cir. 1994) (citing *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572 (Fed.Cir.1991)). Likewise, an indefinite price term will not destroy the underlying mutuality of obligation when a contract indicates a clear intention by both parties to be bound. *Aviation*, 945 F.2d at 1573. As to definiteness, when parties demonstrate a clear intention to be bound, "an agreement which specifies that certain terms will be agreed on by future negotiation is sufficiently definite, because it impliedly places an obligation on the parties to negotiate in good faith." *Id.* at 1572 (citing Corbin, Corbin on Contracts § 97 (1990 Supp.)).

■ The board determined that GKA and HUD emerged from their July 1997 meeting* with completely different understandings about the period of time for which the agreement to reprice would be applied. The board held that any promise by HUD to reprice work that had already been performed would require a return promise by GKA; otherwise, HUD's purported promise would fail for lack of consideration. Under this pre-existing legal duty theory, the board held that Modification 2 lacked adequate consideration to reprice the retroactive period. It was therefore not enforceable because GKA was already under an obligation, and in fact had already performed, during the prior fifteen months under the previously agreed upon rates for Task Orders 13 and 14.

The board overlooks that GKA was not under an obligation to provide any of the

---

* The July 1997 meeting was the first instance in which GKA negotiated its position with an officer with actual contracting authority. The board therefore held that there could not have been any express or implied agreement to reprice Task Orders 13 and 14 at an earlier time. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997) ("A contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States.").

additional services set forth in Modification 2. The contract provided that work requirements, delivery schedule, funding arrangements, and travel requirements for each task order would be negotiated separately. Since the contract minimum had already been met, HUD had the right to forgo new task orders and to seek a new contractor, and GKA could decline future orders. Nevertheless, the parties entered into Modification 2 for Task Orders 13 and 14. HUD thereby received a substantial benefit because the timing of the next omnibus contract was a concern, and it preferred not to have a lapse in performance. The board determined that GKA likely would not have entered into Modification 2 except for HUD's willingness to conduct an audit and to make a price adjustment based upon actual levels of effort. Indeed, the board concluded that "[t]here was consideration for the task order extensions because GKA agreed to proceed on the task order extensions without an immediate price increase." We differ from the board, however, in that we conclude the agreement to enter into Modification 2 provided sufficient consideration to reprice Task Orders 13 and 14 after the audit was conducted, both prospectively and retroactively.

The board's findings were sufficient to conclude that GKA's agreement to enter into an extension was contingent upon a complete repricing. So long as GKA insisted that a retroactive price adjustment was a condition of the extension, HUD could not have forced GKA to enter into a new task order, agree to an extension of an old order, or provide services solely on HUD's terms. GKA's promise to perform the tasks under Modification 2, when it was not so obligated, was sufficient consideration for HUD's return promise to retroactively and prospectively reprice Task Orders 13 and 14.

■ HUD also asserts that no contract exists because the parties did not share a mutual assent or a "meeting of the minds" on the repricing structure. *See* Restatement (Second) of Contracts § 17(1) (1981) (The formation of a contract requires "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."). But that is not the case because the duty to negotiate a future price-term in good faith may provide the necessary mutuality of obligation to enforce an open-price term contract. *Aviation*, 945 F.2d at 1572–74. "Such an obligation gives the contract certainty by allowing the courts to determine when a breach has occurred by determining whether the parties have negotiated in good faith." *Id.* at 1572. Here, the offer and acceptance were unambiguously conveyed, and the surrounding circumstances make clear that the parties manifested an intent to be bound.

HUD asserts that the terms of both modifications are patently ambiguous because they at once refer to future and past performance. The ambiguity issue was not briefed by the parties, and the board made no factual findings or conclusions of law. We think the prudent course is to remand so the board can address these matters in the first instance.

### Conclusion

Accordingly, the decision of the board is reversed, and the case is remanded for further consideration.

*REVERSED AND REMANDED.*