John H. DALTON, Secretary of the Navy, Appellant,

v.

CESSNA AIRCRAFT COMPANY, Appellee.

No. 95–1409.

United States Court of Appeals, Federal Circuit.

Oct. 22, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Dec. 31, 1996.

Opinion for the court filed by Circuit Judge SCHALL. Dissenting opinion filed by Circuit Judge NEWMAN.

SCHALL, Circuit Judge.

This action arises under the Contract Disputes Act of 1978, as amended ("CDA"), 41 U.S.C. §§ 601–613 (1994). The United States Navy ("Navy") appeals from part of the decision of the Armed Services Board of Contract Appeals ("Board") in *CESSNA Aircraft Co.*, ASBCA No. 48118, 95–1 BCA (CCH) ¶ 27,560, 1995 WL 113915 (March 6, 1995). In its decision, the Board sustained the appeal of CESSNA Aircraft Company ("Cessna") seeking an equitable adjustment under its contract with the Navy for flight training services. We reverse.

## BACKGROUND

### I.

Cessna was awarded Contract No. N00019–83–C–0090 ("the contract") by the Navy on May 10, 1983. *Cessna*, 95–1 BCA at 137,344. The contract was a firm fixed-price services contract titled "Undergraduate Naval Flight Officer/Training System Upgrade (UNFO/TSO)." *Id.* Under the contract, Cessna was to provide services to assist in radar and navigation training for undergraduate naval flight officers ("UNFOs"). *Id.* The procurement grew out of the fact that the T–39 aircraft the Navy had been using in its UNFO training program were becoming obsolete. *Id.* at 137,345. In 1981, the Navy decided to enter into a multi-year contract for training services under 10 U.S.C. § 2306(g) (1994),[1] rather than purchase its own equipment. *Id.*

The Navy issued a Request for Information ("RFI") on May 14, 1982, setting forth what it was contemplating in its procurement and inviting potential bidders to attend a presolicitation conference to be held on May 27, 1982. *Cessna*, 95–1 BCA at 137,345. In its RFI, the Navy stated: "Annual flight training systems will be designed to support a tactical [Naval Flight Officer] training rate

Laureen Kapin, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellant. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Richard E. Rice, Assistant Director. Of counsel on the brief were R. Anthony McCann, Department of the Navy, Arlington, VA, and Evadne Sanichas, Department of the Navy, of San Bruno, CA.

Michael T. Janik, McKenna & Cuneo, L.L.P., Washington, DC, argued, for plaintiff-appellee. With him on the brief were C. Stanley Dees and John P. Wunderli.

Before NEWMAN, LOURIE, and SCHALL, Circuit Judges.

---

1. 10 U.S.C. § 2306(g) allows an agency to "enter into contracts for periods of not more than five years" for certain types of services, "for which funds would otherwise be available for obligation only within the fiscal year for which appropriated."

of from 300–350 students per year. For planning purposes the estimated flying hours needed to conduct this training will range from 12,000–17,000 hours per year." The RFI did not specify any contemplated number of hours per graduated student. *Id.* at 137,346. The Navy also stated that the RFI "represents a reliable statement of the Navy requirement and possible procurement approaches for satisfying this requirement."

At the pre-solicitation conference, potential bidders asked questions about the procurement and had them answered. *Cessna,* 95–1 BCA at 137,345. On June 29, 1982, the Navy distributed to potential bidders, in written form, the questions and answers from the pre-solicitation conference. *Id.*

A number of questions at the conference addressed the issue of the rate of flight training services that the contractor would be required to provide. In response to all such questions, the Navy consistently referred potential bidders to the then-forthcoming Request for Quotations ("RFQ"). One question asked, "If [Navy] is going to modify the [training] syllabus where will they get their info and training?" The distributed answer read: "The Navy does not intend to modify the syllabus."

Cessna representatives met with the Navy's Wing Commander, Captain Thaubald, on September 9, 1982, and questioned him about the 17,000 hour provision. *Cessna,* 95–1 BCA at 137,346. Captain Thaubald testified before the Board that, at that meeting, he indicated to Cessna that "current usage projected 12,000 flying hours annually, but that if Congress approved a battle group increase the [Navy] would use 17,000 hours." *Id.*

On October 1, 1982, the Navy issued its RFQ. *Cessna,* 95–1 BCA at 137,345. The services that the contractor was to provide were described in Section C, titled "Description or Specifications." It stated that the contractor was to

> provide services to assist in Radar and Navigation training of Undergraduate Naval Flight Officers. These services shall consist of an annual rate of 17,000 airborne training service hours (approximately 58 airborne training hours per graduated student) on Contractor-furnished radar equipped aircraft of common configuration.

*Id.* at 137,344. Because of a gradual phase-in of services, the contractor was to begin providing a total of 17,000 airborne training service hours in the third year of the contract (FY 1986). *Id.* The "Program Description and Objectives" section of the RFQ reiterated the language of Section C, stating that "[h]ands-on training on the radar within the aircraft, as well as the training instructor pilot services, will consist of airborne training services of 17,000 hours per year (approximately 58 hours per student)." Other parts of the contract recited the 17,000 airborne training service hours ("ATSH") provision unaccompanied by the 58–hour parenthetical. These clauses called for 17,000 hours of flight services to be provided in the third, fourth, and fifth program years and in the option years.

Attached to the RFQ were a Statement of Work ("SOW") and the training syllabus then used by the Navy in the UNFO program. Paragraph 3.1.2 of the SOW defined the scope of contractor support services:

> The Contractor shall furnish all equipment and services required to ensure the UNFO Training System is available for Navy use in accordance with the provisions of this SOW.... The Contractor shall provide sufficient aircraft to accomplish the annual UNFO training rate requirement and meet a 95% mission completion rate. The Government may or may not order flights on any given day, depending on the necessity of the work and suitability of flying conditions. The schedule of operations will be planned by the Government with the cooperation of the Contractor's Representative. Most flight operations will be conducted during daylight hours, however some night and overnight operations will be required. The current training syllabus requires three (3) overnight flights per week of one (1) or two (2) night's duration.

Attached to the SOW was the training syllabus or "curricula" then in use by the Navy. Paragraph 3.1.1 of the SOW stated, "For Contractor planning purposes, copies of the existing curricula currently used by the

Chief of Naval Air Training for training student Naval Flight Officers are attached." There was no indication in the SOW as to whether or not the syllabus would be altered by the Navy. According to the syllabus appended to the SOW, the UNFO training program was to be conducted in five curricula grouped into three phases: basic (one curriculum), intermediate (one curriculum), and advanced (three curricula).

The basic flight training was conducted on Navy aircraft, not on Cessna's T–47 aircraft, and thus was not part of the 17,000 hour requirement. The intermediate curriculum required 12 hours of training for all UNFOs. After completing the intermediate phase, an UNFO would take one of the three curricula in the advanced phase. Each curriculum in the advanced phase had its own hourly training requirement. For example, UNFOs in the "Tactical Navigation" segment would receive 37.2 training flight hours; UNFOs in the "Overwater Jet Navigation" segment would receive 37.2 training flight hours; and UNFOs in the "Radar Intercept Officer" segment would receive 46.3 training flight hours. Therefore, UNFOs in the Radar Intercept Officer program would receive the most training flight hours. By adding the 12 flight hours in the intermediate curriculum to the 46.3 flight hours in the Radar Intercept Officer curriculum, a bidder could deduce that an UNFO would receive up to 58.3 hours of training.

After the RFQ was issued, a post-solicitation conference was held on October 18–19, 1982. *Cessna*, 95–1 BCA at 137,346. At the conference, potential bidders had a chance to ask questions and have them answered. On October 29, 1982, the Navy distributed the questions asked at the conference, along with answers to the questions. *Id.* Among the questions asked and answered were the following:

Question: Would the annual rates for services remain constant over the life of the contract? If not, what factors could cause it to change? If an option to extend the contract is exercised, how would the rate change?

Answer: The annual rate . . . for services needed should be proposed by the contractor based on RFQ requirements.

Question: What factors will be used to determine the annual rate for services?

Answer: The contractor should propose the annual rate for services based on the RFQ.

On November 8, 1982, the Navy released the answers to additional questions that had been received. One question and its answer were as follows:

Question: To enable each offeror to propose the most cost effective solution, will the government specify the following:

1) Fuel cost per gallon.

2) Escalation factor.

3) Expected flight hours (We understand that the 17,000 may be the maximum[) ].

Answer: As previously stated, we cannot reveal the price of fuel to be used, nor can we reveal the other factors used to estimate fuel costs.

In its proposal, submitted in response to the RFQ on December 1, 1982, Cessna stated: "Personnel and aircraft requirements have been derived based on required training service levels and are based on current experience as modified to meet the levels established in the RFQ." Before the Board, James Lyle, Program Manager for Cessna, testified that Cessna relied upon the training syllabus attached to the SOW in preparing its bid.

In its April 4, 1983 best and final offer, which incorporated by reference its December 1, 1982 proposal and which was revised on April 25, 1983, Cessna offered fifteen radar equipped T–47 aircraft to replace the Navy's T–39 aircraft, rather than the twenty it had originally thought necessary. *Cessna*, 95–1 BCA at 137,347. Cessna also offered a lower price in its best and final offer than it had previously bid. *Id.* Cessna based its best and final offer upon the training syllabus that was attached to the RFQ, and upon the clause stating that approximately 58 flight hours per student would be required. *Id.* at 137,346–47. According to Cessna, it calculated that the Navy would use the full

contingent of 17,000 hours contemplated in the specification only if the Navy increased the number of students it trained under the program. *Id.* at 137,347. The Board found that both Cessna and the Navy projected that if the Navy were to keep training students at the same rate as it had under the training syllabus, a maximum of only 12,000 flight hours would be utilized. *Id.* at 137,346.

In its December 1, 1982 proposal, however, Cessna referred to the 17,000 ATSH provision without qualification. In describing radar and navigation training, Cessna stated that "[u]nder the prospective contract, Cessna is to provide services to assist in radar and navigation training of UNFOs consisting of an annual rate of 17,000 airborne training service hours in Cessna-furnished radar-equipped aircraft of common configuration." Referring to the "Full–Up Operational UNFO/TSU Services Phase" of the contract, Cessna stated: "During this phase, flying hour availability will be 17,000 hours per year."

## II.

After entering into the contract and reaching the later years, the Navy realized that it was not utilizing 17,000 ATSH per year. *Cessna,* 95–1 BCA at 137,348. In order to use all of the ATSH for which it believed it had contracted, the Navy updated its training syllabus to increase the number of flight hours per UNFO to 78 hours. *Id.* at 137,349. The Navy also made operational changes to the scope of the services it was utilizing under the contract. *Id.* at 137,349–51. In terms of operational changes, the Navy began requiring Cessna to transport non-student passengers, such as Navy VIPs and Navy officers who needed to log flight hours in order to receive flight pay. *Id.* at 137,349–50. The Navy also required Cessna to perform rescue flights, and to make overnight flights above and beyond those specified in the contract. *Id.* at 137,350. In addition,

the Navy used Cessna's aircraft to conduct target flights. *Id.* at 137,359–51.

 Objecting to the use of the updated syllabus and to the operational changes, Cessna filed a certified claim for an equitable adjustment with the contracting officer on June 1, 1987. Cessna stated that it was seeking an equitable adjustment because the Navy had made constructive changes to the contract, such as (i) using Cessna's "services to fly nontraining missions as well as to fly missions outside the contract's training parameters," and (ii) changing "the UNFO training syllabus to increase the flight training requirements from those provided by the Navy for bidding purposes." Cessna and the Navy negotiated until October 4, 1988. On October 11, 1988, pursuant to the CDA, Cessna filed an appeal with the Board on the ground that the contracting officer had not issued a final decision within a reasonable time.[2]

On February 2, 1989, the contracting officer issued his decision denying Cessna's request for an equitable adjustment. With respect to the issue of whether the updated syllabus constituted a change requiring an equitable adjustment under the changes clause of the contract, the contracting officer stated, "I find that the syllabus is irrelevant to the annual 17,000 hour requirement. I find that the contract clearly entitles the Navy to 17,000 hours of airborne training services each year." With respect to the operational changes, the contracting officer found that Cessna was not entitled to an equitable adjustment.

## III.

The Board rendered a 3–2 split decision in the appeal. The Board unanimously determined that the operational changes were outside the scope of the contract and thus constituted changes.

With respect to the change in the syllabus, the Board concluded that "the Navy did not simply buy 17,000 undefined airborne train-

---

2. If "the contracting officer has failed to issue a final decision on the contractor's claim or to notify the contractor of the time within which a decision will be issued, and at least 60 days have passed since the date the claim was submitted

for a decision," 41 U.S.C. § 605(c)(5) (1994), then the claim is "deemed denied," *Pathman Const. Co. v. United States,* 817 F.2d 1573, 1575 (Fed.Cir.1987).

ing service hours. The contract, albeit, not necessarily in one place, refined and defined precisely what an airborne training hour was to be." *Cessna,* 95–1 BCA at 137,351. The Board found that the Navy "promised [Cessna] that no more than approximately 58 hours of ATSH would have to be spent per student" and allowed an equitable adjustment in price for the change in syllabus. *Id.* at 137,352. The Board determined, based on the testimony of Navy personnel, that "the Navy assumed the risk that it would not be able to use the full 17,000 hours."[3] *Id.* at 137,347.

In reaching its decision, the Board rejected the Navy's argument that the 17,000 hour provision was the only limitation on its use of ATSH under the contract. Instead, the Board determined that Cessna "was indeed obligated to provide up to 17,000 ATSH per year without price adjustment but only so long as ... [t]hose hours averaged out to 'approximately 58 hours per graduated student' as set out parenthetically in the contract schedule." *Cessna,* 95–1 BCA at 137,-352. The Board further determined that the Navy had promised that it would not change the syllabus (and thus alter the 58–hour provision) and that the contractor would not have to provide an average of more than 58 flight hours per student. *Id.* The Board interpreted the Navy's November 8, 1982 written response to a bidder's question about the expected number of flight hours that is quoted above as a promise that it would not change the syllabus calling for 58 hours of flight training per UNFO. *Id.* The Board concluded that the 58–hour parenthetical "would not have precluded the Navy from using 17,000 hours had the Navy increased the number of students. But those written qualifying words do preclude the Navy from increasing the stated number of hours per graduated student without some price adjustment." *Id.*

Reasoning that because the contract was "neither for requirements nor for an indefinite quantity," the two dissenting judges interpreted the 58–hour parenthetical as "an

estimate dependent on such variables as the actual number of students trained per flight (which may affect instruction efficiency), the specific training equipment (as to which the contract allowed some latitude), and the particular training curriculum utilized." *Cessna,* 95–1 BCA at 137,354. The dissent found unreasonable Cessna's interpretation of the 58–hour parenthetical as a binding provision. The dissent further stated that even if Cessna's interpretation were reasonable, the interpretation gave rise to a patent ambiguity. *Id.* Under these circumstances, the dissent stated, "pre-award inquiry would be necessary." *Id.*

## DISCUSSION

### I.

■ We review appeals brought pursuant to the CDA under the standard of review set forth in 41 U.S.C. § 609(b) (1994):

> the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

In this case, the government does not challenge the Board's findings of fact. Rather, as discussed below, it argues that the decision of the Board is incorrect as a matter of law. We are therefore presented solely with issues of law. We review issues of law *de novo. Triax–Pacific v. Stone,* 958 F.2d 351, 353 (Fed.Cir.1992).

On appeal, the government does not challenge the Board's decision insofar as it relates to the operational changes—passenger flights, rescue flights, overnight flights, and target flights. Therefore, we are not called upon to disturb the Board's holding that Cessna is entitled to (1) an equitable adjustment in price for the overnight flights and the target flights, and (2) damages for the

---

**3.** Charles L. Marshall, who had been the contracting officer on the contract, testified that the

Navy intended to pay for 17,000 ATSH whether

passenger flights and rescue flights.[4] *Cessna*, 95–1 BCA at 137,354.

What the government does challenge on appeal is the Board's holding that Cessna is entitled to an equitable adjustment as a result of the syllabus change increasing the number of flight hours per UNFO to 78 hours. The government contends that the Board's holding is incorrect as a matter of law in two respects. First, the government argues, the Board erred in construing the phrase "annual rate of 17,000 airborne training service hours (approximately 58 airborne training hours per graduated student)" as calling for 17,000 ATSH, qualified by the provision of approximately 58 training hours per UNFO. As seen above, the Board determined that the 17,000 hour requirement set forth in Section C was merely a contingency that would depend upon an increased number of students, rather than a flat requirement of 17,000 hours of service annually. The government's interpretation is that the Navy contracted for an unqualified 17,000 ATSH and that the reference to 58 hours per student was merely an estimate. Under the government's interpretation, a change in the syllabus to increase the number of training hours per student could not give rise to a claim for an equitable adjustment so long as the Navy did not use more than 17,000 ATSH. Second, the government asserts that Cessna's interpretation of the contract necessarily gave rise to an ambiguity of which Cessna was aware. Under these circumstances, Cessna was under a duty to seek clarification before submitting its proposal, which it did not do. Accordingly, Cessna is barred from recovery. For its part, Cessna responds that the Board correctly interpreted the contract. Addressing the government's second argument, Cessna contends that any ambiguity in the contract was latent and that, accordingly, under the doctrine of *contra proferentem*, it was not required to seek clarification. For the reasons set forth below, we hold that Cessna is barred from seeking an equitable adjustment for the syllabus change because, in view of its interpretation of the contract, it was under a duty to seek clarification before submitting its proposal.

## II.

It is undisputed that the contract was a firm fixed-price services contract. Such a contract

> provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties.

48 C.F.R. § 16.202–1 (1995).[5]

According to the Federal Acquisition Regulations ("FAR"), fixed-price contracts are "suitable for acquiring commercial items . . . or for acquiring other supplies or services on the basis of reasonably definite functional or detailed specifications." *Id.* at § 16.202–2. The regulations suggest situations where this type of contract may be appropriate, such as when performance uncertainties can be identified and reasonably

---

it flew them or not. *Cessna*, 95–1 BCA at 137,347.

4. In a footnote in its brief, the government argues in passing that "[b]ecause the contract required Cessna to provide 17,000 ATSH per year, . . . the Navy's position is that Cessna has already been paid for providing training to student flight officers. Consequently, Cessna is entitled only to compensation for any added expenses that Cessna incurred solely" due to the operational changes. We express no views on the correctness of this statement. As noted above, the amount of Cessna's recovery is to be the subject of further proceedings before the Board.

5. The Federal Acquisition Regulations replaced the Federal Procurement Regulations System, the Defense Acquisition Regulations, and the NASA Procurement Regulations. 48 Fed.Reg. 42102 (September 19, 1983). 48 C.F.R. §§ 16.202–1 and 16.202–2 correspond to Armed Services Procurement Regulations 3–404.2(a) and 3–404.2(b) of the Federal Procurement Regulations System. In any event, there is no dispute between the parties as to the nature of a firm fixed-price contract.

quantified. *Id.* at § 16.202–2(d). Because fixed-price contracts do not contain a method for varying the price of the contract in the event of unforeseen circumstances, they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract.

Contract interpretation is an issue of law. *Interstate Gen. Gov't Contractors v. Stone*, 980 F.2d 1433, 1434 (Fed.Cir.1992). Reading the 58–hour statement in the context of the entire contract, we conclude that it was reasonable for the Navy to interpret the statement as an estimate. First, given that this was a firm fixed-price contract that assured Cessna would be paid regardless of the number of airborne flight hours the Navy consumed,[6] it was reasonable for the Navy to take the position that the contract should not be interpreted as containing a provision potentially qualifying the manner in which the Navy used the full amount of the services procured. Put another way, in the setting of this contract, in the absence of language clearly and unambiguously placing a qualification on the *manner* in which the Navy could consume the services it was procuring, it was reasonable for the Navy to interpret the reference to 58 hours per graduated student as an estimate. This was especially so, we believe, in view of the fact that the 58–hour statement appeared in parentheses and was qualified by the word "approximately." In short, it can hardly be said that the statement was clothed in the garb of a binding contractual provision.

In addition, settled principles of contract interpretation lead us to the conclusion that it was reasonable for the Navy, when viewing the contract as a whole, to construe the 58–hour parenthetical as an estimate, rather than a binding provision. We read the language of a particular contractual provision in the context of the entire agreement, *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983), and construe the contract so as not to render portions of it meaningless, *Fortec Constructors v. United States*, 760 F.2d 1288, 1292

(Fed.Cir.1985). Also, we apply the interpretation that accords a reasonable meaning to each of the provisions. *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 979 (1965). Finally, where an agreement contains general and specific provisions which are in any respect inconsistent, "the provision directed to a particular matter controls over the provision which is general in its terms." *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed.Cir.1992). Here, we are faced with separate provisions of a single contract, one set of provisions specific and one general. The specific provisions of the contract are the portions of the syllabus noted above that called for 17,000 hours of flight services for various work items for the third, fourth, and fifth program years and for the option years, without qualification as to the number of hours per student. The general provisions, of course, are the sections of the contract containing the "58 airborne training hours per graduated student" parenthetical. The Navy could reasonably take the position that the contract as a whole, including the more specific provisions, compelled the conclusion that the 58–hour parenthetical merely represented an estimate and therefore did not place a qualification on the extent of the services to which the Navy was entitled under the contract.

The foregoing notwithstanding, we will assume for the purpose of deciding this appeal that it was reasonable for Cessna to construe the "annual rate of 17,000 airborne training service hours" provision as qualified by the "approximately 58 airborne training service hours" parenthetical. We hold as a matter of law, however, that, in view of the nature of the contract and the principles of contract interpretation noted above, this construction of the contract gave rise to a patent ambiguity. *See Newsom v. United States*, 230 Ct.Cl. 301, 676 F.2d 647, 649 (Cl.Ct.1982) ("The existence of a patent ambiguity is a question of contractual interpretation which must be decided de novo by the court."). We presume both Cessna and the government "to be endowed with at least a modicum of

---

**6.** Before the Board, the contracting officer testified that the Navy intended to "pay for 17,000

[hours] whether [they] flew it or not."

business acumen," *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971), and we view Cessna as a knowledgeable bidder. Cessna should have recognized that its construction of the contract—based as it was upon a qualified parenthetical statement—was squarely in conflict with the construction of the contract that reasonably flowed from the basic nature of the contract (firm fixed-price) and its provisions. This patent ambiguity created an obligation on Cessna's part to seek clarification before submitting its proposal. *Fortec Constructors*, 760 F.2d at 1291 ("The existence of a patent ambiguity in the contract raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation."); *S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 546 F.2d 367, 369 (1976) ("The case presents another example of a contractor who, faced with a patent ambiguity in Government bid documents, did not meet his responsibility to have the ambiguity resolved before bidding.").

■■■ Faced with what it should have recognized as a patent ambiguity—in light of its interpretation of the firm fixed-price contract—Cessna did not meet its obligation of inquiry. It has never been asserted that Cessna sought clarification from the Navy with regard to its interpretation of the RFQ before submitting its proposal. At the same time, none of the questions and answers provided to prospective bidders by the Navy clarified the point. We have quoted above the questions and answers that are pertinent to this issue. These questions and answers either do not address the issue or are ambiguous. In any event, contrary to what the Board determined, it cannot be said that they provide a basis for concluding that the Navy shared Cessna's construction of the contract. Under these circumstances, Cessna did not meet its obligation of seeking clarification. *See Community Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1580 (Fed.Cir. 1993) ("The Navy's response to the . . . letter expressly failed to address the issue of the conduit sleeves and thus provided a strong indication to Community that confusion still existed between the parties. Community was therefore obligated to request further clarification regarding the proper installation of the conduit sleeves."); *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1571 (Fed.Cir.1991) (holding that a "somewhat evasive" response by the government to bidders' pre-bid questioning was sufficient to "clearly put bidders on notice" that the government intended to restrict option pricing). Having failed to seek clarification, Cessna was not entitled to rely upon its interpretation of the contract. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 998 (Fed.Cir.1996) ("If a solicitation contains contract language that is patently ambiguous, a protestor cannot argue, before the Board or before this court, that its interpretation is proper unless the protestor sought clarification of the language from the agency before the end of the procurement process.") The Board therefore erred in holding that Cessna was entitled to an equitable adjustment by reason of the syllabus change.

## CONCLUSION

For the foregoing reasons, the part of the Board's decision that relates to the syllabus change is reversed.

## COSTS

Each party shall bear its own costs.

*REVERSED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

The Armed Services Board of Contract Appeals, resolving the several disputes arising from this contract, found that the Navy did not have unrestricted use of Cessna's aircraft and flight services up to 17,000 hours of flight time. The Board held that it was an incorrect interpretation of the contract to require Cessna to provide services beyond those explicitly set forth in the contract, up to the maximum of 17,000 hours. This is the ruling that the Navy appeals.

The Board held that the Navy's requirements imposed after the contract was let, that Cessna fly VIP's to various places, that the Cessna planes be used for target flights, that Cessna fly to ski and beach resorts and passengers' hometowns, that the Cessna

planes be used for general rescue flights, that the Cessna planes be used to provide flight time for non-student Navy personnel, that Cessna fly substantially more than three overnight flights per week, and that Cessna provide substantially more than 58 flight training hours per student, all violated the contract. The Board explicitly rejected the government's argument that it had unlimited call on up to 17,000 hours of Cessna's flight time.

The Navy appeals only one category of unauthorized activity. The Navy does not appeal the Board's findings concerning the 17,000 hour ceiling, including the Board's finding that the explicit contract limitations are not overridden by an open-ended entitlement to 17,000 flight hours for any purpose. The Board heard testimony to the effect that both the Navy and Cessna viewed the contract in the same way when it was bid; *i.e.*, that the 17,000 hours was a maximum figure to accommodate possible enlargement of the Wing, and not a blank check for flight activities beyond those explicitly provided. There was no unresolved, patent ambiguity at the time the contract was entered into.

The contract explicitly provided for "approximately 58 hours" of flight training per student. In evidence was the statement of the contracting officer that the Navy "does not intend to modify the syllabus." Section 3.1.1 of the Statement of Work provided that the curriculum for student training (the Syllabus) was attached for "Contractor planning purposes" and that its purpose was to "define the contractor effort necessary to support the training requirement of Undergraduate Naval Flight Officers." Although the panel majority chooses to find that there was a patent ambiguity concerning the obligation to provide 58 hours per student, in view of the ceiling of 17,000 hours, the Board, viewing the mutual understandings embodied in the contract, did not find such ambiguity. Indeed, the Navy did not state that it was entitled to 78, not 58, hours per student until three years into contract performance.

The Navy does not dispute, as indeed it can not, that the contract is explicit as to the "approximately 58 hours" of flight time per student. The Navy does not argue that 78 is

approximately 58. The Board rejected the Navy's litigation-created position that it had unlimited call on the Cessna planes and personnel, and held that the Navy was bound by the provisions of the contract, including the provision of approximately 58 hours per student. Indeed, the Navy has taken the strange position of arguing that its own contract requirement is of no significance.

Evidence as to the representations during the bid process were before the Board. There was an inquiry as to the 17,000 figure, and witnesses for both sides testified that their understanding was that this figure was a maximum, "if Congress approved a battle group increase," in the words of the Navy wing Commander. The Navy represented explicitly that its training schedule was 58 hours per student, and included this figure in the contract. The contract states:

> SECTION C—DESCRIPTION OR SPECIFICATIONS ... These services shall consist of an annual rate of 17,000 airborne training service hours (approximately 58 airborne training service hours per graduated student)....

Cessna structured its low bid in accordance with these representations and requirements. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1008 (1972) (if contractors can not rely on government representations "the amounts of the bids received would soon show the results").

The Board held that the Navy was bound by the representations in the Training Syllabus, the pre-bid explanations, and the contract itself. The panel majority, overruling the Board, holds that Cessna was properly required to provide 78 airborne training hours when the Navy so chose, three years into contract performance. The Board found that was not the agreement. Although Cessna took the risk of whether "Congress approved a battle group increase," the stated purpose of the 17,000 hour limit, that did not include a change of the 58 hour figure to 78 hours, any more than it included the Navy's other excursions beyond the contract provisions. This court is required to respect the Board's findings

> unless the decision is fraudulent, or arbitrary, or capricious, or so grossly errone-

ous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b). None of the statutory conditions of reversal is here met. There is no ground for reversing the Board's holding that the contract did not permit enlarging Cessna's various obligations beyond those set forth in the Syllabus, and that the 17,000 hour figure did not contradict the explicit contract provisions as to the various obligations of the parties to the contract.

Nonetheless, the panel majority holds that the requirement of providing approximately 58 flight hours per student is "patently ambiguous" in view of the 17,000 hour figure. The consequence of this holding is very strange, for the panel majority will not hear Cessna's argument on the merits of the issue of contract interpretation. Instead, the panel majority holds that Cessna can not now challenge the Navy's litigation-induced interpretation, on the theory that Cessna should have foreseen and resolved this problem before it entered into the contract. Since it did not, the panel majority holds that Cessna is barred from disputing the government's position, and that Cessna is not entitled even to attempt to sustain the Board's findings in its favor.

The question of the meaning of the 17,000 hour limitation and its effect on the Navy's various attempts to enlarge Cessna's responsibilities under the contract was decided by the Board. This portion of the Board's decision was not appealed. The Navy did not appeal the Board's ruling that the contract did not give the Navy an unrestricted call on 17,000 hours of flight time. It is not before us to re-decide this question.

Thus I must dissent from the ruling of the panel majority, that bars Cessna from challenging the government's position on what this contract means. The role of the courts is to assure fair and just resolution of contract disputes—not to bar access to Board or judicial review. The panel majority, in barring the contractor from the opportunity to challenge the government's current interpretation, disserves the nation in its dependence on private contractors to meet governmental needs. *See United States v. Winstar Corp.,*

—— U.S. ——, ——––——, 116 S.Ct. 2432, 2459–60, 135 L.Ed.2d 964 (1996) (" 'punctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors' ") (quoting *Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934)).

In view of the rules favoring the government that exist only in contracts with the government, to protect those who deal with the government it is essential to distinguish between latent and patent ambiguity. The Board, on full hearing, with witnesses from both sides, determined that the 17,000 hour limit was understood the same way by both sides. No error has been shown in the Board's findings on this point. On this unchallenged finding there can be no patent ambiguity.

However, the panel majority permits none of these approaches to appellate review, and simply reverses the Board's decision, which favored the contractor, on the quixotic ground that the contractor should have foreseen and resolved this dispute before bidding on the contract, and because the contractor did not, it can not now challenge the government's theory. I must, respectfully, dissent.