# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
ASFA Construction Industry and Trade, Inc. ) ASBCA No. 57269
)
Under Contract No. 000000-00-0-0000 )

APPEARANCE FOR THE APPELLANT: D. Lee Toedter, Esq.
Orange Beach, AL

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
MAJ John R. Longley, JA
CPT Tyler L. Davidson, JA
CPT Edward Ahn, JA
Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE PAGE

ASFA Construction Industry and Trade, Inc. (ASFA), appeals from a deemed denial of its claim seeking a $478,476.02 equitable adjustment or, alternatively, a termination for convenience settlement based upon an alleged implied-in-fact contract with the Joint Contracting Command-Iraq/Afghanistan (JCC-I/A) Regional Contracting Center-Balad (RCC-Balad) to repair an asphalt plant and rock crusher at Logistics Support Area (LSA) Anaconda in Balad, Iraq. Our jurisdiction arises from the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. In a previous decision, *ASFA Construction Industry & Trade, Inc.*, ASBCA No. 57269, 11-2 BCA ¶ 34,791, we denied the government's motion to dismiss this appeal for lack of jurisdiction on the basis that the alleged contract did not exist, holding that triable issues remained regarding the parties' respective conduct which precluded dismissal. 11-2 BCA ¶ 34,791 at 171,249. The parties have elected to submit the appeal on the written record pursuant to Board Rule 11. We decide entitlement only. We sustain the appeal.

## FINDINGS OF FACT

1. On 23 August 2007, the JCC-I/A RCC-Balad issued a request for information (RFI) to companies "interested in constructing a concrete batch plant on LSA Anaconda." Potential contractors were asked to respond by 25 August 2007 regarding their planned approach for the construction and operation of the concrete batch plant. Among other questions, the RFI asked potential contractors if they could "bring a batch plant onto LSA Anaconda at your own cost and the possibility of no work to start with." (R4, tab 1) At the time, only one concrete contractor was on Balad Air Base and the government did not

want to bring in concrete from outside the base due to security concerns regarding the potential for explosives to be hidden within the concrete. Through the RFI, the government was attempting to increase contracting capability operating inside the base to meet its concrete requirements and also to secure more competitive prices. (R4, tab 50 (Berg dep.) at 16-18)

2. ASFA responded to the RFI by letter dated 25 August 2007 (R4, tab 2).

3. By memorandum dated 5 September 2007, contracting officer (CO) Chad D. Miller notified potential contractors that they would "be given the opportunity to present their plan of constructing a [concrete] batch plant" during a one-hour oral presentation on 19 September 2007. Topics to be addressed included equipment, set-up, barrier material, raw materials, labor, delivery and security, quality of concrete work, and financial resources. Potential contractors were directed to submit a "read ahead packet" to the government by 14 September 2007. (R4, tab 3)

4. ASFA provided the required read ahead packet to the government prior to its oral presentation (R4, tab 22). ASFA outlined by brand name, model designation, and (where appropriate) capacity of the concrete batch plant, stone crusher plant, mixer truck, and other pieces of equipment and vehicles that ASFA intended to provide (*id.* at 5). ASFA stated that "[a]ll equipment is ready to be shipped to Anaconda at the ASFA warehouse in Turkey," and that "delivery to Anaconda can be completed within 45 days." ASFA further stated that installation "can be compl[e]ted within 30 days upon arrival of all the equipment in Anaconda." (*Id.* at 7)

5. By memorandum dated 31 October 2007, Lt Col Todd M. Burkhardt, USAF, Chief, RCC-Balad, notified ASFA that it had been selected to build a concrete batch plant on Balad Air Base, stating:

> 1. Congratulations! ASFA Group has been selected as the contractor to build a batch plant on Balad Air Base, Iraq. This award is based on your verbal presentation for the construction of a concrete batch plant on Balad Air Base, Iraq.
>
> 2. We are currently working with Terrain Management to get the land for the batch plant and rock crushing area. The land space we had was determined to be unsuitable and we are diligently working to get a new area. We will let you know as soon as the land is available.

2

3. Please acknowledge receipt of this letter in the space provided below and promptly return a signed copy of this letter to the addressed [sic] noted above.

4. We look forward to your company joining our contract support team and anticipate a prosperous working relationship.

5. Refer any questions to [Kimberly Burt].

(R4, tab 4) ASFA acknowledged receipt of the memorandum on 2 November 2007 (*id.*).

6. An asphalt plant and a rock crusher had been abandoned on the land to be given to ASFA to erect its concrete batch plant. It was the government's practice to use this leftover or "stay-behind" equipment for its own purposes. (Berg dep. at 31-36). Following the concrete batch plant award notice, CO MAJ Robert J. Berg conducted a terrain walk with Mr. Orcan Fikirdanis, an ASFA site representative. During the terrain walk, CO Berg instructed ASFA to push the abandoned, government-owned asphalt and rock crushing equipment aside. (*Id.* at 27-28, 30-32)

7. An 18 November 2007 email entitled "Batchplant Update" from Capt Karsten E. Lipiec of the Terrain Management Office, The Mayor's Cell, LSA Anaconda, to LTC Joseph Tyron, CO Berg and others provided:

> Gentlemen, I went out and did a survey of your asphalt plant/crusher. See attached slide.[1] [CO] Berg from contracting has offered the [ASFA] company to clean this up as part of their contract to start a new concrete batch plant here....
>
> My plan would be for your equipment to be stored near the perimeter, in a fenced-in, locked location not too far from here.... As you mentioned, your equipment does not run but you plan to fund an expert to troubleshoot it for you NET Jan 08.
>
> [CO] Berg,
>
> Sir, given this new information, how feasible is it to have [ASFA] perform this work? Once clear, the land could

---

[1] The email included an attached document entitled "20 BDE Asphalt Plant.ppt" (R4, tab 6). That document, however, is not included in the record.

3

> support set-up of [ASFA's] equipment. [ASFA's] plant requires 11,300 square meters. It could easily fit into the 28,467 SM measured here.

(R4, tab 6)

8. A 10 December 2007 email from CO Kristopher J. Pondo, Capt, USAF, advised ASFA:

> You are allowed to open an asphalt plant on Anaconda. The lot of land will no longer be divided but will be ASFA's for both an asphalt and concrete plant. A letter will soon follow signed by [CO] Berg and [LTC] Tyron. For now I am authorizing you to proceed.

(R4, tab 7)

9. By a 10 December 2007 memorandum from LTC Tyron and CO Berg, the government notified ASFA that it had been selected to build an asphalt plant in addition to the concrete batch plant, stating:

> 1. Congratulations! ASFA Group has been selected for as [sic] the contractor to build another batch plant on Balad Air Base, Iraq. This award is based on your verbal presentation for the construction of an asphalt batch plant on Balad Air Base, Iraq.
>
> 2. We are currently working with Terrain Management to get the land for the batch plant and rock crushing area. The land space we had was determined to be unsuitable and we are diligently working to get a new area. We will let you know as soon as the land is available.

ASFA was asked to acknowledge receipt of the "Notice of Award," and told to direct any questions to CO Pondo. (R4, tab 8)

10. In authorizing ASFA to establish an asphalt plant, the parties intended that ASFA use the abandoned government-owned asphalt equipment present on Balad (Berg dep. at 47-48). CO Berg testified that the government-owned asphalt plant was non-operational and in poor condition because "somebody had cannibalized a lot of the components of all this equipment" (*id.* at 40-41). However, when asked during a deposition whether the government was aware that the asphalt plant was in disrepair at the time the notices of award to establish the concrete and asphalt plants were issued to

4

ASFA, CO Pondo testified "No." (R4, tab 53 (Pondo dep.) at 141). ASFA's CEO, Mr. Faruk Cercer, testified at a deposition, on behalf of ASFA pursuant to Federal Rule of Civil Procedure 30(b)(6), that although ASFA knew that the asphalt equipment "might not be 100 percent operational" as of 10 December 2007, ASFA was not fully aware of the state of disrepair until an inspection "[i]mmediately after the award" (R4, tab 47 (Cercer dep.) at 86-88). We find, consistent with Mr. Cercer's testimony and Capt Lipiec's 18 November 2007 email, that ASFA and the government were aware that the asphalt plant was not operational prior to 10 December 2007, but were unaware of the extent of disrepair until after that date.

11. CO Berg testified to the following:

> Q    So if you needed aggregate for concrete, and that was your primary emphasis, why did you award the Notice to Proceed and Award for the development of the asphalt plant?

> A    First of all, let's go back to the beginning. We were doing a terrain walk. In the terrain walk with ASFA, in looking at -- when we saw the piece of equipment, we noticed there was an asphalt -- an asphalt -- leftovers of an asphalt plant from the government, from some engineering unit.

> And at that point in time I remember the guy asked me, do we buy asphalt. And I said, occasionally we do....

> So he said, if we have the asphalt plant, can we compete for that business? And I said sure, no reason you can't compete for the business. So they came back with a proposal, a plan to fix the asphalt and to compete for that. So that's how the asphalt came in.

> And when word came around that they were going to put an asphalt in, there was a lot of folks that liked that idea. The Air Force liked that idea. Obviously the engineers liked the idea. So there was some government folks that said, that's a good idea. We can use that asphalt plant here in Iraq.

> So it was based on the fact that ASFA said they can get an asphalt plant up using that piece of equipment that was left behind.

(Berg dep. at 85-86) We find, based on CO Berg's testimony, that ASFA offered to repair the non-operational asphalt plant and rock crusher in exchange for use of the repaired equipment in future asphalt competitions and that the government agreed.

12. By 18 January 2008, the parties had discovered that the government-owned rock crusher and asphalt plant were missing necessary parts. CO Pondo's email of that date to other government "addressees" noted that "someone has been taking essentially stealing parts off of the machine," including "computer parts from the asphalt plant, engines, and conveyor belts." CO Pondo made clear that he would ensure that anyone discovered having taken these things would "not do business on this base, in all of Iraq or with the U.S. Government anywere [sic]." (R4, tab 21 at 23)

13. In a 21 January 2008 email to CO Pondo and CO Berg entitled "ASFA – Rock Crusher & Asphalt Plant," Mr. Fikirdanis stated that he "would like to [take over] the equipment at the yard in 'as is' condition" before returning to Turkey for medical treatment two days later. CO Berg replied the same day stating that the "20th Engineer [Brigade] are [sic] ready to sign over the equipment to your company," and asked who could sign for ASFA. Mr. Fikirdanis's 21 January 2008 reply stated that he would "like to sign the necessary documentation." In response, CO Berg asked: "[CO] Pondo can you arrange this?" (R4, tab 24)

14. According to a 28 January 2008 email from CO Pondo to Mr. Fikirdanis:

> The 20th Engineers have said that the program office who owns the rock crusher and asphalt machine will pay for the parts. If we buy the parts we would like you to install them. We are just waiting for the guy to come out to do the assessment to tell us what is needed. It is told to me that the guy will be out here mid February or early March. I will get you in contact with him as soon as I learn more information.
>
> As far as the transfer of property goes, I want to wait till the machine is fully restored after we install the parts. Then we can transfer the rock crusher and asphalt machine over as a solid piece of usable equipment. This transfer will not take place till April timeframe. Please let me know if you have any questions.

(R4, tab 9) CO Pondo testified that it was his understanding, as of 28 January 2008, that ASFA would be repairing the asphalt plant and rock crusher based on "[t]he 20th Engineering telling me at that point that they would buy the parts and that they would–they would buy the parts and that ASFA would repair the machine" (Pondo dep. at 32-33). CO Pondo's deposition testimony included the following exchange:

6

    Q      How did you intend to communicate your
thought that ASFA will be repairing the asphalt plant and
rock crusher? How did you intend to communicate that to
ASFA?

    A      That they will be making repairs? They offered
to make the repairs.

    Q      Did you accept their offer?

    A      No.

    Q      Did you reject their offer?

    A      I said there was no contract. I mean, there was
no contract. However, they agreed to -- they said if you
would give us the parts, we'll make the repairs on that.

    Q      Did you concur with their offer at any point in
time?

    A      To repair them? Yes.

(*Id.* at 37) CO Pondo further testified that ASFA would recover the costs of repairing the asphalt plant and rock crusher through a follow-on Blanket Purchase Agreement (BPA) for asphalt (*id.* at 33-34). Mr. Cercer likewise testified that ASFA was promised a BPA in return for installing parts on the asphalt plant and rock crusher (Cercer dep. at 28, 50). We find, based upon verbal exchanges and supported by written correspondence, that by 28 January 2008 the parties had reached a tacit agreement under which the government would purchase necessary parts for the asphalt plant and rock crusher, ASFA would install those parts and make the necessary repairs, and the government would allow ASFA to use the government's repaired asphalt and rock crushing equipment and award ASFA an asphalt BPA in return.

    15. A chain of emails began on 28 January 2008, as CO Pondo wrote Mr. David S. Schwartz, Assistant Product Manager, Team Leader Construction Equipment, SFAE-CSS-FP-C, to introduce Mr. Fikirdanis:

    I would like you to meet Mr. Fikirdanis. He is one of
    our contractors out here, who will be repairing the [a]sphalt
    plant and rock crusher. I told him I would get him in contact
    with someone who knew a bit about the machines. Any

7

assistance to Mr. Fikirdanis would be helpful to us here at Balad.

(R4, tab 10 at 4-5)

16. Mr. Schwartz's email reply of 29 January 2008 advised CO Pondo:

I am working on sending two FSRs [field service representatives] to Balad to inspect the crusher and work with unit personal [sic] to order parts to get it fixed. Once parts arrive in country, the FSRs will return and repair the crusher, provide training, and then leave. Where does Mr. Fikirdanis fit into all this and what does he need from me?

(R4, tab 10 at 4)

17. In response to Mr. Schwartz's query, CO Pondo stated, by email dated 31 January 2008:

The company ASFA group has stated that if we give them the parts necessary for the repairs that they would make the repairs themselves. After the machines are fully operable, we are planning to turn them over to the contractor as GFE [government-furnished equipment] so they may use them to produce [a]sphalt and concrete out here on Balad. We would then cut a BPA with ASFA at a cheaper price to buy the materials from them.

(R4, tab 10 at 3)

18. Mr. Schwartz responded on 31 January 2008, telling CO Pondo that "[m]y contract does not cover anything to do with giving parts to the ASFA group." He noted that his organization was "only working on the crushing plant," and stated that the FSRs would "return to install [parts] with help from the unit, or ASFA if the 20th wishes, get the crushing plant operational, and provide training." Mr. Schwartz further stated:

I am aware that the 20th wishes to turn the plant over to a contractor and we will provide the necessary training so they can operate and maintain the crushing plant.

I believe that we can help with providing what you need to
support your BPA with ASFA after the FSRs leave.

(R4, tab 10 at 2-3)

19. On 4 February 2008, Mr. Fikirdanis inquired by email of CO Pondo regarding
the "[c]urrent status of [a]sphalt tanks which [have] been taken by PMA [another
contractor]." Mr. Fikirdanis also asked for "[s]ome form of an agreement for utilization
of the [a]sphalt plant." CO Pondo replied that he would "get an update from PMA"
regarding the tanks, and advised Mr. Fikirdanis that "the agreement will be worked out
with [CO] Berg as he will be taking over the details of this project." (R4, tab 25)

20. By 5 May 2008, Mr. Doug Schmidt, a field service representative, completed
his inspection of the rock crusher. By email dated 5 May 2008, CW4 Raymond P. Hursh
provided ASFA with a copy of a list of repair parts prepared by Mr. Schmidt.
CW4 Hursh's 5 May 2008 email to ASFA also forwarded an email from the rock crusher
manufacturer that stated: "Per Doug's request, here is the information on the authorized
Terex | Cedarapids, Inc. dealer in Turkey. Any parts that the Turkish company
overseeing the CSWP in Anaconda wants to buy will need to go through these people."
(R4, tab 26)

21. In a 16 June 2008 email, CO Thomas E. Tortorella, Capt, USAF, asked ASFA
to "provide a cost estimate on how much you think it would cost to replace the parts on
the asphalt plant (not the rockcrusher)." Mr. Aytekin Aydemir, contract manager for
ASFA, replied the next morning that it would take time for ASFA to provide an estimate.
CO Tortorella's 17 June 2008 email response reminded Mr. Aydemir that the estimate
should only pertain to the asphalt plant. (R4, tab 27) CO Tortorella testified that he
could not recall why he asked ASFA to provide a cost estimate. CO Tortorella further
denied directing ASFA to purchase parts for the asphalt plant. (R4, tab 57 (Tortorella
dep.) at 66, 73-74) We find, however, that CO Tortorella's 16 June 2008 email indicated
the government was considering having ASFA provide parts for the asphalt plant.

22. By July 2008, responsibility for purchasing parts for the rock crusher had
shifted to ASFA (R4, tab 11; *see also* Tortorella dep. at 78-79; finding 20). On 7 July
2008, CO Tortorella inquired of Mr. Aydemir: "What is the status of the Rockcrusher?
Are you planning to purchase parts for the Rockcrusher[?]" Mr. Aydemir responded to
CO Tortorella's inquiry, "Some parts have been provided from Turkey and some have
been ordered from USA. All the materials will be loaded at one time when we receive
the rest of materials from USA and send it here [t]o Balad." (R4, tab 11)

23. On 6 September 2008, Mr. Mehmet Z. Senler, an ASFA site manager in
Balad, emailed Mr. Cercer describing a conversation between Mr. Senler and
CO MAJ Jason R. Conde regarding the asphalt plant. According to Mr. Senler's email,

9

Mr. Senler informed CO Conde that the parts for the rock crusher had arrived at Balad and were being installed. Mr. Senler also requested a letter from CO Conde stating that ASFA is authorized to operate the asphalt plant.[2] CO Conde stated, according to Mr. Senler's email, that he could not provide such a letter, noted that the matter has taken too much time, and stated that if ASFA wanted to retain possession of the asphalt plant it should provide a letter "with the information on when you can start operating, what would be the daily amount of production, [and the] possible unit price of approximate production." (R4, tab 28 at 1)

24. CO Conde was unfamiliar with the asphalt plant matter when first contacted by ASFA (R4, tab 56 (Conde dep.) at 66-67). By letter dated 12 September 2008, ASFA provided CO Conde with a history of the rock crusher and asphalt plant repair effort. According to ASFA's letter, in or about June 2008 the government told ASFA that the government providing the missing parts for the asphalt plant and rock crusher would take too long, except for the parts at PMA's jobsite, and that "if those parts are provided by [ASFA], it would be easier." ASFA advised CO Conde that "[r]ight after [the] government's decision we started to work" and consequently ordered parts for the rock crusher and asphalt plant. ASFA's letter also told the CO that it had to get back the parts from the PMA site, that the capacity of the asphalt plant would be approximately 1500 tons/day, and that the sales price would be approximately $140-$150 per ton. (R4, tab 12)

25. In a 17 September 2008 email to Mr. Senler, CO Conde stated:

> I have thoroughly discussed your issues and concerns to the individuals that determine the final disposition of the GFE (Government Furnished Equipment) that you have in your possession. Additionally, I gave them all of the supporting documentation that you have provided me and they are in the process of determining what to do with this equipment based on all the facts.
>
> As I have stated in our several meetings, the equipment in question is not owned by my organization [n]or was it provided to you in a contractual agreement, because of this fact I am no longer in a position to further address your

---

[2] The letter was needed to facilitate discussions between ASFA and the asphalt plant manufacturer (R4, tab 28 at 1-2).

concerns. This is clearly not a contract issue, but a Mayor Cell / Terrain [m]anagement and [e]quipment owner issue. They are fully aware of the situation and from this point on I cannot proceed any further with this issue.

(R4, tab 30 at 2)

26. On 18 September 2008, ASFA emailed CO Pondo, who was no longer in Balad, and requested that he contact the "Mayor cell or [CO] Jason R. Conde" regarding the asphalt plant and the rock crusher (R4, tab 29 at 1-2). CO Pondo replied to ASFA on 23 September 2008:

I sent an e-mail to the Major. I am waiting for a reply from him.

Please do not discuss the offering of a job or anything to the Major. My reason for helping is not bec[au]se of the job offer, but bec[au]se I would like to straighten out any error on the government[']s part.

As far as a job goes I would have to put it on hold for now. I will definately [sic] keep you in mind though.

(R4, tab 30 at 1) CO Pondo emailed ASFA again on 25 September 2008, stating that he had "heard nothing from the Major" (R4, tab 44, ex. 32). Although CO Pondo testified that he actually sent an email to CO Conde (Pondo dep. at 82), CO Conde testified that he did not remember receiving an email from, or talking to, CO Pondo (Conde dep. at 83).

27. The record contains a memorandum for record by 1LT James M. Sering entitled "REMOVAL OF ASPHALT EQUIPMENT FROM ASFA AREA." The memorandum suggests the government removed the asphalt equipment from ASFA's control on or about 17 September 2008.[3] (R4, tab 29 at 3) However, CO Conde testified that he did not think that the asphalt equipment was actually removed (Conde dep. at 79-80). A 20 February 2009 invoice for 385,836.40 TL (Turkish Lira) indicates that ASFA continued to buy repair parts after September 2008 (R4, tab 44, ex. 47 at 4-5, tab 49, ex. 49 at 1-2). We find that the government allowed ASFA to retain possession of the asphalt plant and rock crushing equipment beyond September 2008 (see R4, tabs 47, 49 at 2).

---

[3] Although the memorandum is dated 18 August 2008, it refers to events on 16 and 17 September 2008.

11

28. In late August 2009, the government was preparing to dismantle the asphalt plant and rock crusher (R4, tab 60 (Allen dep.) at 98). After being told by an ASFA representative that ASFA had purchased over $300,000 in missing parts (*id.* at 97), CO LT Kevin W. Allen sent a 24 August 2009 email to Mr. Ibrahim H. Cigerli, an ASFA site manager, asking: "What are the contract numbers associated with the attached two notices of award[?]" (R4, tab 33 at 3). CO Allen explained that "[t]his is needed in order for us to determine exactly what ASFA was required to do by the government" and stated that "[n]o further action will be taken until the requested information is received" (*id.*). On 29 August 2009, CO Allen emailed Maj Jack L. Nemceff II, USAF, Commander RCC-Balad, Maj Donald A. Jones, 557 ERHS (Expeditionary Red Horse Squadron), USAF, and others stating that he "cannot authorize any action be taken" pending ASFA's response to his inquiry. Maj Jones replied to CO Allen on 29 August 2009 stating: "Well, we aren't throwing anything away but we will start taking it down nicely and putting [it] in a safe place (RPAT yard). If they have a valid claim we will bring it right back to them good as new!" CO Allen responded, with copy to Mr. Cigerli, that "it would be in the government's best interest to do nothing" pending a response from ASFA. (*Id.* at 1-2)

29. ASFA responded to CO Allen's 24 August 2009 email on 3 September 2009. ASFA referred CO Allen to CO Pondo as a government official familiar with events that had taken place regarding the asphalt plant and rock crusher. ASFA noted that it repaired those items at the government's request, and advised that ASFA would seek compensation for repairs it had made:

ASPHALT PLANT AND ROCK CRUSHER:

....

After [the government–supplied technical representative] prepar[ed] the list of the missing parts of the rock crusher, expected parts had not arrived [at] Anaconda until June 2008. Several verbal communications took place and the government determined that providing these parts would take a long time and ASFA accepted to provide these parts in order to make at least the rock crusher operational. Thus, ASFA provided all necessary parts to repair the crusher and spent approximately $100K to include purchasing of missing parts, transportation, installation costs and other site expenses. Necessary paperwork regarding to these expenses may be submitted to your office if requested.... The rock crusher was fully repaired by December 2008.

12

...[A]dditionally, ASFA made several investments, purchased some of the missing parts...but never could produce asphalt due to missing parts of the GFE equipment.... We were also told by the contracting office that a BPA asphalt contract would be followed after correction of the plant which had never been happened. On the other hand, it is understood by ASFA that now, the rock crusher is intended to be removed from our site even though it was given us as a GFE under a mutual agreement.

....

If the GFE equipment will be required to be returned to the government, we will be in a position to request you to compensate all our losses raised from the rock crusher and asphalt plant repairs and other losses by not providing missing parts of the asphalt plant.

(R4, tab 13)

32. On 8 September 2009, ASFA emailed CO Allen stating: "We could not find a documentation authorizing us to purchase missing parts for the GFE in writing.... This repair was definitely based on the discussions between [CO Pondo] and our site representative at that time." (R4, tab 34) CO Allen replied:

We are in the process of attempting to contact [CO] Pondo for his side of the story. I really need documentation from a government representative giving ASFA the authority to purchase the missing parts on behalf of the government. Without such documentation I can only assume ASFA acted at its own risk.

(R4, tab 44, ex. 35) CO Allen was unable to contact CO Pondo (Allen dep. at 81).

31. In or about October or November 2009, SFC Kevin L. Miller, 194th Engineer Brigade, conducted a technical inspection of the rock crusher and asphalt plant (R4, tab 59 (Miller dep.) at 43, 153). SFC Miller determined that the rock crusher and asphalt plant were missing numerous parts, that the asphalt tanker and dedrummer required structural repair, and that the rock crusher was not fully operational (*id.* at 43-67, 153-55).

32. On 17 November 2009, ASFA wrote TSgt Robert E. Powell at RCC-Balad to relate that appellant's site office had been informed that the government was removing

13

the asphalt plant and rock crusher from Balad and that "ASFA will be soon be subject to a demobilization request from the base." Appellant told TSgt Powell:

> . As it was discussed in multiple occasions with your office in the past, ASFA has been invited by your office and thereafter awarded the rights of the following by separate award letters;
>
> > 1. To install and operate a company owned concrete batch plant and operate
> >
> > 2. To install and operate existing GFE asphalt plant and rock crusher

(R4, tab 14 at 1) ASFA referred TSgt Powell to its prior "discussions with [CO] Pondo, the former contracting officer in RCC Balad," and told TSgt Powell that:

> It was also discussed with [CO Pondo] separately that they would select a company to award the asphalt plant operating right based on their technical capabilities and the Government would provide fully functional asphalt batch plant equipment completed with a rock crusher to be installed and operated by the successful contractor. The award would again be followed by an IDIQ type asphalt supply contract. After an evaluation period of the contractors' capabilities, ASFA again has been selected for the award.

(*Id.* at 1-2) ASFA reminded TSgt Powell that it was discovered during an inspection that the government's asphalt plant and rock crusher were not operational, due to missing major parts (*id.* at 2). ASFA urged TSgt Powell to verify with CO Pondo that the government had promised to provide parts for the asphalt plant and rock crusher but failed to do so, resulting in ASFA purchasing required parts (*id.*). ASFA alleged that it was damaged by the government's: failing to provide a functioning rock crusher and asphalt plant and award concrete and asphalt IDIQ contracts to ASFA as promised; ordering ASFA to demobilize the concrete and asphalt batch plants within a short period and without compensation; and depriving ASFA of the opportunity to supply the government and third parties with asphalt, rock and concrete (*id.* at 2-3). ASFA asked TSgt Powell to reconsider the government's decision requiring ASFA to demobilize. ASFA told him that while ASFA would "certainly obey all orders" from the government, it would seek compensation for its losses if the government persisted with removal of the asphalt plant and rock crusher. (*Id.* at 3)

33. Upon receiving ASFA's 17 November 2009 letter, TSgt Powell passed it on to Mr. Richard E. Early and took no other action (R4, tab 55 (Powell dep.) at 79-80).

14

34. By memorandum dated 20 November 2009, CO MSgt Marvin C. Frazier informed ASFA that he was authorizing the government to disassemble and remove the rock crusher and asphalt plant:

> 1. The purpose of this memorandum is to authorize the 557 ERHS to disassemble and relocate the Government Furnished Property (GFP) located on Joint Base Balad (northend area) as provided to ASFA Group under a partnering agreement in 2007. All equipment associated with the respective rock crusher and asphalt plant is Government property and is hereby authorized [for] disassembly and relocation to the US. All efforts are deemed in the best interests of the US Government in support of drawdown efforts associated with Operation Iraqi Freedom.

(R4, tab 15)

35. On 27 November 2009, Maj Nemceff, Commander RCC-Balad, issued a memorandum to the Real Property Management Office entitled "Notice of Termination of Services (ASFA Group)." The memorandum stated that "no pending contracts (construction and services) remain outstanding and under the purview of the Regional Contracting Center for subject vendor." The memorandum further stated that "any forthcoming warranty work associated with any construction contracts with subject vendor has been waived...to facilitate action(s) required by the Real Property Management Office to notify subject vendor to vacate all land assignments and terminate all lease agreements with Joint Base Balad, Iraq." (R4, tab 16)

36. CO Frazier wrote ASFA on 30 November 2009 regarding its "Claim: Asphalt Batch Plant, Joint Base Balad," and stated that although the government had received ASFA's "claim for materials and equipment purchased in support of [the] subject requirement," the government was "unable to proceed with processing your claim" in accordance with Federal Acquisition Regulation (FAR) Part 33 and the Contract Disputes Act. He stated that the following were required before the government could evaluate ASFA's claim: the contract number; a total amount; a request for a final decision of the contracting officer; and ASFA's certification of a claim exceeding $100,000. CO Frazier directed ASFA to provide this information no later than 10 December 2009. (R4, tab 17 at 1)

37. Email exchanges between the parties dated 10 December 2009 show that ASFA reminded the government that "no contract number was formally assigned to this award." ASFA told the government that its 17 November 2009 letter was not a claim, but rather a "heads-up notification of a future claim if the government intends to remove [the]

15

asphalt plant." (R4, tab 17 at 2) The government declined to extend its stated deadline for ASFA's claim beyond 11 December 2009 unless ASFA provided the requested information (*id.* at 3-4).

38. On 5 December 2009, Col David F. Demartino, USAF, Commander 332d EMSG, provided ASFA with a written "Notice to Leave Joint Base Balad." ASFA was told that while the government "appreciate[d] the services your company provided to help improve the facilities and infrastructure at Joint Base Balad and the 332d Air Expeditionary Wing," the base was "undergoing a responsible drawdown that positions the installation for transfer to the government of Iraq." Drawdown activities included "a reduction of the overall contractor presence," and as a "substantial decrease in new projects is anticipated...now is the time for contractors to depart the installation as their existing contracts expire and their services are no longer needed." Col Demartino advised ASFA that "[b]ased upon your company's pending contract expiration and our responsibility to reduce personnel" at Balad, the government asked that ASFA "make preparations to vacate the base within thirty days of receiving this notification." ASFA was instructed to leave the work site "cleared and cleaned up in accordance with local real estate policies"; otherwise, any remaining items would "become government property" and expose ASFA to fines for failure to comply. (R4, tab 18)

39. By email dated 9 December 2009, ASFA provided CO Frazier with a proposed demobilization schedule, with demobilization activities starting 10 December 2009 and concluding 31 May 2010 (R4, tab 19). CO Frazier forwarded the proposed schedule to Lt Col John E. Tryon, USAF, 332d ECES (R4, tab 38 at 2). Lt Col Tryon emailed ASFA on 9 December 2009 stating, "Thank you for this information, but six months seems too long to simply dismantle a batch plant and clean up the camp areas.... CE agrees to sponsor ASFA for a 60-day demobilization period." (*Id.* at 1) On 10 December 2009, ASFA replied that it "has one of the most equipped camps in Anaconda" and that the "period of 60 days will not be sufficient for demobilization" (*id.*).

40. ASFA prepared a "Certified Claim for Equitable Adjustment" dated 8 March 2010 in response to the government's 30 November 2009 letter (R4, tab 21). ASFA categorized its request as one for an "Equitable Adjustment" or, in the alternative, seeking a "Termination for Convenience settlement" and sought $478,476.02 for work done to repair the asphalt plant and rock crusher (*id.* at 1-2). ASFA's "SUMMARY OF EVENTS" explained that the "US Government awarded a contract to ASFA...to install and operate [an] existing GFE asphalt plant and rock crusher" (*id.* at 1). After the government discovered that these items were missing significant parts and were not in working order, ASFA said it "was requested to bring these equipments operational" and told by the government that it "would be issued a base-wide IDIQ asphalt contract." ASFA contended that, as a result of its efforts, the "GFE Rock Crusher was repaired in full and maintained operational," and that ASFA had also provided missing parts needed to make the asphalt plant operational. ASFA said that it had complied with the

16

government's 20 November 20[09] direction to disassemble the rock crusher and asphalt plant. (*Id.* at 2) ASFA sought a contracting officer's final decision (*id.* at 3), and Caner Dokuzoglu, Deputy General Manager for ASFA, certified the claim (*id.* at 4). ASFA attached several enclosures including certain correspondence between the parties and supporting documentation for the claim (*id.* at 5-31).

41. ASFA appealed the deemed denial of its claim by notice of appeal dated 15 June 2010.

## DECISION

*The Parties' Positions*

ASFA contends that the dispositive issue in this appeal turns on the existence of an implied-in-fact contract for the repair of the government-owned asphalt plant and rock crusher (app. br. at 22). Appellant argues that it has met all the elements to establish such an implied-in-fact contract. ASFA asserts that there was a mutuality of intent between it and the government for ASFA to repair the inoperable government-owned asphalt plant and rock crusher. (*Id.* at 23) It contends that the government wished to repair the asphalt plant and rock crusher, but lacked the financial resources to order the repair parts and complete the repair effort itself (*id.* at 20-21). ASFA maintains that it offered to repair the government-owned asphalt plant and rock crusher and to use them for the production of asphalt at LSA Anaconda/Joint Base Balad (*id.* at 23). ASFA asserts that it provided consideration as demonstrated by its expenditure of funds for materials, repair parts, and labor as part of the repair effort (*id.* at 22-23). Appellant argues that the government accepted its offer as evidenced by the 10 December 2007 notice of award and notice to proceed and the government's promise "to issue the Appellant an express contract for the production output [of the asphalt plant and rock crusher] when the repairs were completed," and that this acceptance was accomplished by an authorized contracting officer (*id.* at 23). ASFA notes that the government provided it with technical expertise, through the field service representatives, to assist ASFA in determining the deficiencies with the government's inoperable equipment (app. br. at 21, 25).

ASFA argues that it purchased materials and supplies from Turkey and the United States with knowledge and encouragement of the government. It asserts that it performed repair work on both the asphalt plant and the rock crusher, but that the repair effort was incomplete when the government ordered the demobilization of the equipment. (App. br. at 25) ASFA contends that the government's position that ASFA was allowed to possess and alter government-owned equipment in the absence of an agreement between ASFA and the government strains credulity (app. reply br. at 2-3). ASFA maintains that the government benefitted from its repair efforts to the asphalt plant and the rock crusher and that it is entitled to compensation for that work (*id.* at 3).

17

The government denies that an implied-in-fact contract between it and ASFA ever existed (gov't br. at 36). The government argues that there was no mutual intent to contract for the repair of the asphalt plant and rock crusher; rather, the parties understood that ASFA would use the government-owned equipment "as is" (*id.* at 38). The government contends that ASFA's deficient repair work evidences that ASFA "was attempting to convert this equipment [the asphalt plant and rock crusher] to its own use" and that ASFA "did not believe it was under any obligation to repair or maintain this equipment for the benefit of the government" (*id.* at 40-42). The government argues that ASFA's "belief that it was not under any contractual duty" is further evidenced by ASFA's "persist[ence] with its non-standard repairs after being told by [CO] Conde on 17 September 2008 that it did not have a contract with the government relating to the equipment" (*id.* at 42). The government further asserts that neither CO Tortorella's nor CO Pondo's communications evidence an intent to contract (*id.* at 43-45). The government argues that any alleged contract lacked sufficient definiteness to be enforceable (*id.* at 45-46). The government argues that ASFA has failed to establish offer and acceptance, and that the 10 December 2007 notice of award does not constitute acceptance of any offer (*id.* at 46-48; gov't reply br. at 2-3). The government asserts that "[h]ad an actual agreement been reached between the parties under this scenario [where the appellant would repair the government's equipment using government provided repair parts], the government would have provided parts," and contends that the fact that "the government never provided any repair parts" demonstrates that no such agreement was reached (gov't br. at 48-49). The government argues that ASFA's expenditure of funds is insufficient to establish consideration and that no benefit was conferred upon the government (*id.* at 39-40, 50-55).

*Discussion*

*The Existence of an Enforceable Implied-in-Fact Contract*

The parties vigorously debate whether a valid and enforceable contract exists between ASFA and the government for the repair of the asphalt plant and rock crusher. The Board's jurisdiction under the CDA is predicated upon an "express or implied contract" between a contractor and the government. 41 U.S.C. § 7102(a). The term "implied contract" in the CDA refers only to implied-in-fact contracts; the Board has no jurisdiction with respect to contracts implied-in-law. *Beyley Constr. Grp. Corp.*, ASBCA No. 55692, 08-2 BCA ¶ 33,999 at 168,141; *P&C Placement Servs., Inc.*, ASBCA No. 54124, 06-2 BCA ¶ 33,373 at 165,446. We have found that, by 28 January 2008, the parties had reached an understanding by which ASFA would install government-purchased parts on the asphalt plant and rock crusher, and in return the government would allow ASFA use of the repaired equipment and award ASFA an asphalt BPA to provide ASFA an opportunity to recoup the costs of making the repairs (finding 14), and to compete for future work on the base (finding 11). In support of that effort, the government provided expertise, in the form of the field service representative, in identifying the parts missing from the rock crusher (findings 16, 20). The primary

18

question before the Board is whether the parties' tacit agreement constitutes an enforceable implied-in-fact contract for repair of the government-owned asphalt plant and rock crusher. We hold that it does.

ASFA bears the burden of proving the existence of an implied-in-fact contract. *Altanmia Commercial Mktg. Co.*, ASBCA No. 55393, 09-1 BCA ¶ 34,095 at 168,584. An implied-in-fact contract is founded upon a meeting of the minds and "'is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012) (quoting *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003)); *see also Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1297 (Fed. Cir. 1986) ("A contract implied in fact is not created or evidenced by explicit agreement of the parties, but is inferred as a matter of reason or justice from the acts or conduct of the parties."). The requirements for an implied-in-fact contract with the United States Government "are the same as for an express contract; only the nature of the evidence differs." *Hanlin*, 316 F.3d at 1328; *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). The elements of proof to establish a valid contract with the government are: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) actual authority on the part of the government representative to bind the government in contract. *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). In this appeal, the government does not dispute the authority of its contracting officers to bind the government in contract (gov't br., *passim*; gov't reply br., *passim*). We note that a number of contracting officers were involved over the course of events, thereby contributing to a discontinuity of the government's knowledge and actions.

Mutuality of intent is essential to the formation of a contract with the government. *Walsh Constr. Co. of Ill.*, ASBCA No. 52952, 02-2 BCA ¶ 32,024 at 158,279, *aff'd*, 80 F. App'x 679 (Fed. Cir. 2003). To satisfy its burden to prove mutuality of intent, ASFA must show, by objective evidence, the existence of an offer and reciprocal acceptance. *Anderson*, 344 F.3d at 1353; *Yonir Technologies Inc.*, ASBCA No. 56736, 10-1 BCA ¶ 34,417 at 169,897. We have found that ASFA offered to repair the non-operational asphalt plant and rock crusher in exchange for use of the repaired equipment in future on-base asphalt competitions (finding 11), an unambiguous offer. Once an offer is made, for a contract to be formed there must be an acceptance of the offer. *Anderson*, 344 F.3d at 1355. "It is essential that 'acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain.'" *Northrop Grumman Sys. Corp. Space Sys. Div.*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,237 (quoting *Russell Corp. v. United States*, 537 F.2d 474,482 (Ct. Cl. 1976)). We find such acceptance here. CO Pondo testified at his deposition, albeit reluctantly, that he "concurred" in ASFA's offer to repair the asphalt plant and rock crusher using government-provided parts. CO Pondo's acceptance is further manifested by his 28 January 2008 email to

19

Mr. Fikirdanis, in which he states that the 20th Engineer Brigade would pay for parts for ASFA to install in the rock crusher and asphalt plant, followed by a transfer of the equipment to ASFA "as a solid piece of usable equipment." (Finding 14) On the same day, CO Pondo sent an email to Mr. Schwartz describing Mr. Fikirdanis of ASFA as the contractor "who will be repairing the [a]sphalt plant and rock crusher" (finding 15). Accordingly, the elements of mutuality of intent to contract, and offer and acceptance are met.

The relationship between the parties was not static, but evolved over time. The parties originally contemplated the government providing the necessary parts to repair the asphalt plant and rock crusher (findings 14, 17). While the government provided a field service representative to inspect the rock crusher and develop a parts list (finding 20), the responsibility to purchase the repair parts ultimately shifted to ASFA (findings 21-22, 24). As relayed by ASFA to CO Conde in its 12 September 2008 letter, the government determined that it would take too long for it to provide the repair parts and that "it would be easier" for ASFA to do so (finding 24). ASFA's account is supported by CO Tortorella's 16 June 2008 and 7 July 2008 emails, asking ASFA to provide a cost estimate to "replace the parts on the asphalt plant" and inquiring whether ASFA was going to purchase parts for the rock crusher (findings 21-22). Although CO Tortorella denied directing ASFA to purchase parts for the asphalt plant (finding 21), neither CO Tortorella nor CO Conde removed the asphalt or rock crushing equipment from ASFA's control or otherwise directed ASFA to cease its repair effort. The government manifested its assent to appellant's position that ASFA was to purchase the parts necessary to complete the repair effort by allowing the company to continue possessing the asphalt plant and rock crusher knowing, particularly after ASFA's 12 September 2008 letter to CO Conde, that ASFA was purchasing parts to complete the repairs of this equipment. The record indicates that ASFA did not begin to dismantle the asphalt plant and rock crusher until after November 2009 (see, e.g., findings 39-40).

Additionally, the parties' agreement is supported by consideration. To be valid and enforceable, a contract must be supported by consideration to ensure mutuality of obligation. *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 369 F.3d 1318, 1322 (Fed. Cir. 2004); *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000). ASFA provided consideration by agreeing to install the government-purchased parts and undertake the actual repair effort, a role which expanded over time to include providing parts with government knowledge.[4] In addition to providing expert guidance and parts to assist ASFA in the repair effort, the government promised to provide the repaired equipment to ASFA to use in competing for future on-base asphalt requirements, which

---

[4] The government, relying on SFC Miller's deposition testimony, contends that the allegedly poor nature of the repairs made by ASFA demonstrate a lack of consideration (gov't br. at 52-53). The government's argument conflates consideration with adequacy of performance.

the parties anticipated would be accomplished through an asphalt BPA, in return for ASFA's repair work (finding 14). We are cognizant that, generally, BPAs are themselves not contracts, until an order is placed, due to lack of consideration. *See Production Packaging*, ASBCA No. 53662, 03-2 BCA ¶ 32,338 at 159,972; *Julian Freeman*, ASBCA No. 46675, 94-3 BCA ¶ 27,280 at 135,906-07. The Federal Circuit has characterized BPAs as "reflect[ing] illusory promises that do not impose obligations on either party." *Crewzers Fire Crew Transport., Inc. v. United States*, 741 F.3d 1380, 1382-83 (Fed. Cir. 2014). Accordingly, we are skeptical that the promise of a BPA would, in itself, provide consideration to support a valid contract. We are also not required in this appeal, to discuss whether a promise by a contracting officer to award a BPA, or even a future contract, would contravene regulations or statutes such that the promise could not be considered valid consideration. However, the government did not simply offer to award ASFA a single asphalt BPA; the government agreed to allow ASFA to use the restored asphalt plant and rock crusher in competing for future asphalt procurements in exchange for effectuating repair of the government-owned equipment. CO Pondo's 31 January 2008 email to Mr. Schwartz indicates that the parties anticipated that this arrangement would provide ASFA with a pricing advantage (*see* finding 17). The government's encouragement to use the repaired equipment for anticipated procurements thus had substantial business value and provided consideration, particularly where the government was restricting base access to vendors (finding 1). *See Ace-Federal*, 226 F.3d at 1332 (government's promise to limit competition to schedule contractors provided consideration for Federal Supply Schedule contract); *Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1320 (Fed. Cir. 1997) (government's promise to provide support staff and free space in a hospital sufficient consideration for contractor's promise to provide discounted health care services); *see also Enrique (Hank) Hernandez*, ASBCA No. 53011, 01-1 BCA ¶ 31,220 at 154,103 ("The mutuality of consideration was the Government's obligation in consenting to appellant's performance of bagging services to furnish space for appellant's operations and encourage patrons to tip or, at a minimum, notify patrons that baggers work only for tips.").

The government contends that the parties' agreement is insufficiently definite to be enforceable. A contract is unenforceable unless it is sufficiently definite so as to provide a basis for determining the existence of a breach and formulating an appropriate remedy. *Crewzers*, 741 F.3d at 1382; *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572 (Fed. Cir. 1991). The government argues that "there are no clearly defined terms—no agreement over what repairs were to be performed; no agreement over what standards of repairs would be expected; no agreement over how the government would inspect the equipment...; and no agreement over what date the repairs would be completed by" (gov't br. at 45-46). With regard to the government's first two objections, we find the parties' agreement sufficiently definite; under the repair effort initially contemplated by the parties, ASFA's primary task was to install parts, purchased by the government, necessary to make the asphalt plant and rock crusher operational. The government, through the field service representative, was to provide the list of the

21

specific parts required. That the relationship between the parties evolved and ASFA took on a greater role does not defeat the definiteness of the parties' agreement. Respecting the government's latter two objections, we do not view the lack of inspection and time terms as rendering the parties' agreement insufficiently definite or ambiguous. Rather, the lack of these terms is governed by the Restatement, which provides that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981). The government also argues that there was no contract because CO Pondo's 31 January 2008 email to Mr. Schwartz demonstrates a mutual understanding that future negotiations would occur regarding ASFA's price for asphalt (gov't br. at 44-45). However, it is well settled that "an indefinite price term will not destroy the underlying mutuality of obligation when a contract indicates a clear intention by both parties to be bound." *Gardiner*, 369 F.3d at 1322.

The government's remaining arguments for finding that there is no enforceable contract are unpersuasive. The government first relies on Mr. Schwartz's 31 January 2008 email in arguing that there was no intent to contract (gov't br. at 44). The government's reliance is misplaced. Mr. Schwartz's 31 January 2008 email was in response to CO Pondo's 31 January 2008 email (finding 18), in which CO Pondo explained the terms of the parties' agreement to Mr. Schwartz (finding 17). The government fails to explain how Mr. Schwartz, a non-contracting official, could override the intent of a contracting officer. The government also relies on CO Tortorella's 7 July 2008 email inquiring whether ASFA was planning on purchasing parts for the rock crusher and CO Conde's 17 September 2008 email stating that there was no contract (gov't br. at 42-43). The government's subsequent repudiation of its obligations, however, does not negate the existence of an enforceable contract. Lastly, relying on ASFA's 21 January 2008 email, the government suggests that any agreement was simply to allow ASFA use of the asphalt plant and rock crusher "as is" (gov't br. at 38). But the government agreed that ASFA should restore the equipment to working order and facilitated that effort. We find nothing inconsistent between ASFA's desire to take custody of equipment "as is," expressed in the 21 January 2008 email (finding 13), particularly at a time when the government believed the equipment to be in better shape than it turned out to be (finding 10), and the parties' agreement for the repair of the asphalt plant and rock crusher in exchange for ASFA's use of the repaired equipment. The contracting officers were actively involved in encouraging and enabling ASFA to repair the government's equipment: the government cannot claim to have been a mere bystander to ASFA's efforts.

*The Alleged Constructive Termination of the Implied-in-Fact Contract*

Having determined that the parties entered into an implied-in-fact contract for the repair of the asphalt plant and rock crusher, we must decide whether ASFA is entitled to

22

recover on its claim. ASFA's 8 March 2010 claim seeks $478,476.02 for its efforts to repair the asphalt plant and rock crusher as either an equitable adjustment or in the nature of a termination for convenience settlement (finding 40). Under the *Christian* Doctrine, we incorporate the standard termination for convenience clause, FAR 52.249-2, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (MAY 2004), into the parties' implied-in-fact repair contract. *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426 (Ct. Cl. 1963); *Vec-Tor, Inc.*, ASBCA Nos. 25807, 26128, 84-1 BCA ¶ 17,145 at 85,439-40 (incorporating termination for convenience clause into an implied-in-fact contract pursuant to the *Christian* Doctrine), *recon. denied*, 85-1 BCA ¶ 17,755; *accord Advanced Team Concepts, Inc. v. United States*, 68 Fed. Cl. 147, 152 (2005) ("As with any government contract, express or implied, the government enjoys the ability to terminate a contract for its convenience, absent bad faith on the part of the government."). FAR 52.249-2(a) provides that the government "may terminate performance of work under this contract…if the Contracting Officer determines that a termination is in the Government's interest."

Under the parties' implied-in-fact contract, the government was to purchase parts necessary for the repair effort for both the asphalt plant and the rock crusher, which ASFA was to install (finding 14). By July 2008, the government no longer intended to provide parts for either the asphalt plant or rock crusher and shifted that responsibility to ASFA (findings 21, 22). Prior to the completion of the repair effort, the government began considering demobilizing the asphalt plant and rock crusher in August 2009 (finding 28). In a 20 November 2009 memorandum to ASFA, CO Frazier stated that he was authorizing the disassembly of the equipment for relocation to the United States, which he deemed to be "in the best interests of the US Government in support of drawdown efforts associated with Operation Iraqi Freedom" (finding 34). Col Demartino's 5 December 2009 notice to ASFA also explained that ASFA was to leave Joint Base Balad as part of the government's drawdown of the base (finding 38). These communications constructively terminated the implied-in-fact repair contract for the government's convenience as part of its drawdown of Joint Base Balad. Accordingly, ASFA is entitled to a termination for convenience settlement as provided in FAR 52.249-2.

## CONCLUSION

The government constructively terminated for its convenience an implied-in-fact contract with ASFA for the repair of an asphalt plant and rock crusher. The appeal is sustained. We remand the appeal to the parties for processing of any termination for convenience settlement proposal pursuant to FAR 52.249-2 that ASFA may submit to the contracting officer.

Dated: 8 July 2015

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57269, Appeal of ASFA Construction Industry and Trade, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals